UNITED STATES of America, Plaintiff,

v.

Katrine Teresa RUSH, Defendant.

No. CR 87–0241.

United States District Court,
District of Columbia.

Nov. 10, 1987.

Theodore Shmanda, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Edward Sussman, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

### I.  SUMMARY

This matter is now before me on defendant's motion to suppress both physical and testimonial evidence.  An evidentiary hearing was held on September 18, 1987.  After a careful review of the facts and the relevant caselaw I have concluded that the motion to suppress should be denied.

This case raises two questions.  First, I must determine whether the government had a sufficient basis to "stop" Ms. Rush. I find that the government agents' initial stop of Ms. Rush was justified and measures up to the "articulable suspicion" standard.

Second, I must decide whether the government agents properly searched Ms. Rush's bags.  After the government agents had made their initial, legitimate investigative stop of defendant, I find that they received defendant's voluntary consent to search her baggage.  In reaching that conclusion, I find that at the time the defendant gave her consent to a search of her baggage she was free to leave the premises—that at all times leading up to the agents' discovery of the cocaine in her suitcase she could have walked away had she chosen to do so.  In short, Ms. Rush was not "seized," nor was her freedom to walk away restrained by the government agents until *after* her voluntary consent to search had led to the discovery of a large quantity of cocaine in her baggage.

### II.  FACTS

Based on the testimony of Inspector Calvin Burns, Detective Mike Bernier, Special Agent Paul Kozich and the defendant, Ms. Katrine Rush, and my review of both the government's brief and defendant's two briefs, I find the following relevant facts took place on May 11–12, 1987:

1) On Monday, May 11, Detective Claudo Noriga of the Metro–Dade Police Department's Organized Crime Unit called Inspector William Pearson of the Amtrak Police Drug Enforcement Unit with information about a passenger boarding train 98 in Miami, Florida on Monday, May 11, 1987 at 8:24 a.m. That train was scheduled to arrive in Washington, D.C. on Tuesday, May 12, 1987 at 6:20 a.m. It actually arrived there at approximately 3:00 p.m. that day.

2) The information concerned Katrina ("Trina") Rush, who was described by Detective Noriga as a black female, approximately 5'6", 140–150 pounds, wearing a pink jogging suit and carrying a beige coat bag, a beige handbag and a yellow shopping bag. According to Detective Noriga, Ms. Rush's clothing and baggage all appeared to be new. She was observed arriving at the Miami train station by taxi approximately thirty minutes before the scheduled departure of her train.

3) The Miami agents described Ms. Rush as "very nervous." The agents' check of the passenger list for train 98 revealed that Ms. Rush paid for her one-way $118.00 ticket in cash.

4) The agents telephoned the Miami number which Ms. Rush had provided to Amtrak as a "call back" number. A male answered the telephone. In response to the agent's inquiries about Katrina Rush, he became angry. He wondered why Ms. Rush had given out his number. According to the uncontradicted account of the government agent, the unknown male then stated, "don't ever call this number again."

5) The agents in Miami determined that it would be appropriate to conduct an interview of Ms. Rush upon her arrival in Washington, D.C.

Their suspicion that Ms. Rush was a drug courier and their decision therefore to interview Ms. Rush was based on a number of factors, including: A) Ms. Rush purchased a one-way ticket and she paid for it in cash; B) Ms. Rush arrived at the train station only a half hour before the scheduled departure of her train; C) Ms. Rush arrived at the station by public transportation—a taxicab; D) Ms. Rush made her reservation only the night before the train's departure and was very nervous when she arrived at the Miami train station; E) Ms. Rush listed a home telephone number in Miami, Florida; F) The individual who answered the telephone at the call back number Ms. Rush provided Amtrak made it clear that he did not want to be associated in any way with Ms. Rush and that he was upset that Ms. Rush had given out his telephone number.

6) The Miami agents contacted their counterparts in Washington, D.C. and conveyed to them the information they had gathered. The principal agent in Washington was Investigator Calvin Burns, who was a Baltimore City policeman for six years prior to becoming a special drug enforcement agent for Amtrak in 1976.

7) When Ms. Rush arrived at Union Station in Washington, D.C. she was approached at the top of the track escalator by Investigator Burns and another agent. Investigator Burns asked Ms. Rush if he could talk with her for a few minutes. She gave her assent. Investigator Burns asked her if he could see her ticket and she handed him a one-way ticket stub from Miami to Washington, D.C. in the name of Trina Rush. He then asked for and received some other form of identification. She handed him her Washington, D.C. driver's license—which was issued in the name of Katrine Rush. Investigator Burns testified that it is his routine practice immediately to return such documents to suspects—but that he has no specific recollection exactly when in this instance he gave Ms. Rush back her license and ticket stub.

8) Investigator Burns further testified that he identified himself as a police officer and that he then informed Ms. Rush that he had information from Miami which indicated she "may be carrying drugs." He also testified that he asked her permission for a dog to sniff her luggage and that Ms. Rush agreed to allow the dog to sniff her bags. Upon his request, she moved her bags off to the side away from the flow of exiting passengers and set them on the ground. Then Detective Bernier brought over his narcotic-detecting dog, Max–25

who sniffed the bags and indicated that drugs were inside the large canvas bag. According to the testimony of Max–25's handler, Detective Bernier, of the Mass Transportation Detail of the DEA, Max–25 has found narcotics 53 times and he has been correct better than 96 percent of the time.

Investigator Burns stated that he then asked Ms. Rush if they could search the large canvas bag. She permitted them to do so—signalling her assent by opening her bag—and their search led to the discovery of approximately one kilogram of cocaine in a plastic bag marked "LUCKY."

9) Ms. Rush testified that at no time during her encounter with Investigator Burns did he tell her that she could leave the premises and that he did not inform her of her right to refuse his request to search her bags.

10) While there are some discrepancies between Ms. Rush's testimony and that of Investigator Burns, they are in agreement about many fundamental facts. Where they are in disagreement, I credit the testimony of Investigator Burns. Specifically, I find that Investigator Burns asked Ms. Rush if he could search her bags and that she voluntarily gave her consent. Investigator Burns did not "command" Ms. Rush to unzip her bags—rather, he asked for her consent, which he received.

11) After field testing the white powdery substance found in Ms. Rush's bag and determining that it was cocaine, Investigator Burns and Detective Bernier arrested Ms. Rush. Subsequent to her arrest, the agents discovered a small amount of cocaine concealed in her wallet.

## III. ANALYSIS

### A. *Introduction*

As Justice Powell asserted in *United States v. Mendenhall*:

> The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the

escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

446 U.S. 544, 100 S.Ct. 1870, 1881, 64 L.Ed. 2d 497 (1980). Since Justice Powell penned those words, our nation's drug problem has grown considerably worse. I appreciate the efforts being made by our law enforcement community to fight the growing and destructive drug trade while striving to stay within the limits of the Fourth Amendment.

Regardless of the pace of the growth of the drug trade, however, the Fourth Amendment places important limits on the methods law enforcement officers can utilize to identify concealed drugs. The right of American citizens to travel freely cannot be trampled in the effort to stem the flow of drugs into and around our country.

This case presents difficult, albeit fairly common, issues about what actions law enforcement officers are permitted to take to uncover concealed drugs under the present state of Fourth Amendment jurisprudence.

There are two issues in this case. First, did the government agents possess sufficient information to justify their initial stop of Ms. Rush? Second, did the agents obtain Ms. Rush's *voluntary* consent to search her bags?

### B. *The Stop*

The government agents in this case "stopped" Ms. Rush in Union Station when they first approached her at the top of the escalator. In order to stop Ms. Rush and ask her the questions they posed, the agents did not need to have "probable cause." Rather, I find that the agents' conduct must measure up to the "reasonableness" standard articulated by Justice Powell in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 1880, 64 L.Ed. 2d 497 (1980) (Powell, J., Burger, J. and Blackmun, J. concurring). *See also Terry*

*v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968) (reasonable investigative stop does not offend the Fourth Amendment).

In *Mendenhall,* in the process of finding the specific stop in that case reasonable, the concurring Justices laid down general guidelines for evaluating the reasonableness of any stop. In order to comply with those guidelines, first, I must examine the public interest served by the stop; second, I must consider "the nature and scope of the intrusion"; and third, I must evaluate the "objective facts upon which the law enforcemnt officer relied in light of his knowledge." *See Mendenhall,* 100 S.Ct. at 1881 (citing cases).

There is no question that the public interest in stopping the drug trade is compelling. The Court found it compelling seven years ago in *Mendenhall* and the problem has worsened. In addition, as the Court recognized in *Mendenhall,* and as the Drug Enforcement Agency has repeatedly stressed, Miami, where Ms. Rush originated her trip, is one of the four major drug "source" cities in this nation. *See Mendenhall* at 1881. I find that when Investigator Burns stopped Ms. Rush he was "carrying out a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution." *Mendenhall,* 100 S.Ct. at 1881.

In this case, the scope of the intrusion was minimal indeed. Two agents approached Ms. Rush in a public place where there was no reason for her to feel insecure or nervous. Investigator Burns identified himself as a police officer and asked Ms. Rush if she would show him some identification. As was the case in the initial stop in *Mendenhall,* the agents did not physically restrain Ms. Rush in any way—in fact it seems they did not even physically touch her. Neither agent displayed any weapon and the questions they asked were simple, direct and brief. Thus, there was no reason for Ms. Rush to feel nervous, frightened, isolated or in any way threatened.

The third part of the *Mendenhall* test— "the objective facts upon which the law enforcemnt officer relied in light of his knowledge and expertise"—has essentially been boiled down to whether the officer had "articulable suspicion." *See generally United States v. Cortez,* 449 U.S. 411, at 421–422, 101 S.Ct. 690, 696–97, 66 L.Ed.2d 621 (1981); *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion). As the Supreme Court has instructed, in determining whether the police had "articulable suspicion," I am permitted to take into account Investigator Burns' extensive law enforcement expertise—especially that he has worked in the drug enforcement field for over a decade. In addition, Investigator Burns was an exceptionally credible witness; he exhibited competence and clear thinking on the stand.

Based on Investigator Burns' testimony, I have no doubt that there was sufficient basis to make the stop. All the factors listed at paragraph number five combine to create an articulable suspicion that Ms. Rush may be transporting concealed contraband. Furthermore, I find that the unknown male's hostile response to the telephone call made by the Miami agents is an especially powerful contributing factor to the establishment of articulable suspicion. In addition, Ms. Rush's nervous appearance at the train station provided a further basis for arousing the suspicion of the experienced Miami drug enforcement officials. In short, the factors listed at paragraph five, when taken as a whole, provided the agents with an adequate legal basis to approach Ms. Rush.

When evaluating the objective criteria I believe it is appropriate to consider the results produced by the use of those criteria. In this case, there was a defined, self-contained universe of persons who could have been the subject of a stop. Hundreds of people rode on Train 98 and the agents testified that only one—Ms. Rush—was designated to be questioned. The adequacy of the objective criteria used by the agents to identify suspects is thus buttressed by the fact that they chose only one person from the entire train who met their criteria and that this person was indeed in possession of a sizeable quantity of

drugs.[1] It is obvious to me that these police officers knew their business.

I find that the officers in this case possessed articulable suspicion and that the stop of Ms. Rush did not violate the Fourth Amendment.

### C. The Search

■ Both parties agree that the validity of the search of Ms. Rush's bags hinges on whether or not Ms. Rush gave her voluntary consent to such a search.

My review of the law in this area reveals there has been a great deal of discussion about the concept of consent. There are, however, several guideposts that mark the way to a reasoned decision. The Supreme Court provided the framework for a consent to search analysis in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973), when it stated:

> ... the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent ... [I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In this passage, the Court plainly refused to require the government to show that a consent to search is "knowing"—that is,

made with an awareness that the Fourth Amendment provides a basis for refusing consent to search. *See generally* W. La-Fave, *Search and Seizure: A Treatise on the Fourth Amendment* (1987) at § 8.2. Rather, the Court deliberately chose to require only that the consent be *voluntary*— or free of coercion.

*Schneckloth* provides two other helpful directives. First, the *Schneckloth* Court asserted that:

> Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth*, 93 S.Ct. at 2059. Hence, according to *Schneckloth*, valid consent to a search may be established without a showing that the police advised an individual that he or she had the right to refuse a search. In addition, *Schneckloth* provides that the government bears the burden of proving the voluntariness of an individual's consent to a search. *Schneckloth*, 93 S.Ct. at 2045.

I am satisfied that the consent given by Ms. Rush in this case satisfies the standard laid down in *Schneckloth*. I have no doubt that her consent was not coerced. She gave her consent in a public place. At all times she was free to walk away from the agents. The officers never displayed their weapons or threatened her in any way. Moreover, the agents never even suggested that they would apply for a search warrant if she refused to consent to a search. The agents did not engage in any type of trickery or form of deception. The agents' conduct leaves no doubt that Ms. Rush's consent was given voluntarily.[2]

---

**1.** Because this case involves a self-defined and limited "pool," it is distinguishable from those cases where it is appropriate for defense counsel to maintain that the court "never sees all the mistakes." Generally speaking "bad searches" do not come to a court's attention. Here, however, because the agents could have chosen to question others on the train, and only chose Ms. Rush—that argument is inapposite.

**2.** The Court also provided helpful, albeit general guidance in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980), where it explained how consent can be "voluntary" yet opposed to one's self-interest:

> And in response to the argument that the respondent would not voluntarily have consented to a search that was likely to disclose the narcotics that she carried, we repeat that

Of course, the defendant's knowledge of her right to refuse to be questioned or searched is a factor to be taken into account in determining whether a consent is voluntary, but the prosecution need not prove such knowledge as a prerequisite to establishing that consent was given voluntarily.

In light of the amount of cocaine found in Ms. Rush's bag, unless the drugs were planted in her luggage without her knowledge, it can be reasonably inferred that she was acting as a courier for a business involved in the sale of illegal drugs. Those involved in illegal drug trafficking are engaged in a very hazardous enterprise and it is incumbent on them to know or learn of the perilous risks of their illicit business. There should be no requirement that government officials charged with the eradication of this unlawful activity have a duty to educate those that choose to participate in it. I am not prepared to create a form of *Miranda* warning to be given to drug couriers. The drug trade involves great risks—and the government should not be put in the position of reducing those risks. It is always incumbent on a court to scrutinize a consent to search to insure that it was indeed *voluntary*. But valid consents to searches should not be thrown out simply because the defendant claims he or she was not warned by the police officer of the right to refuse consent.

For the foregoing reasons, I find that Ms. Rush gave her voluntary consent to the search conducted in Union Station on May 12, 1987. This Memorandum Opinion represents my findings of fact and conclusions of law on this issue.

It is therefore

ORDERED that the motion to suppress is hereby denied.

the question is not whether the respondent acted in her ultimate self-interest, but whether she acted voluntarily.

This passage helps explain the Court's conception of how consent can be "voluntary" and "consensual" even though it almost inevitably must lead to the discovery of drugs.