**UNITED STATES of America**

v.

**William G. COLYER, Appellant.**

No. 88–3029.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1989.

Decided June 27, 1989.

---

Louis J. Salerno, II, with whom Robert Lee Muse, Washington, D.C., was on the brief, for appellant.

Sharon M. Collins, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, and Robert G. Andary, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

William G. Colyer appeals his conviction for unlawful possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 841(a) (1982). During pretrial proceedings, Colyer moved that certain physical evidence and statements be suppressed on the grounds that they were obtained in violation of his Fourth Amendment rights. By order dated October 20, 1987, the District Court denied the motions. Colyer subsequently withdrew his plea of not guilty and entered a conditional guilty plea on November 30, subject to his right to appeal the denial of the motions. *See* FED.R.CRIM.P. 11(a)(2). Appellant renews his contentions of constitutional violation. Finding no infirmity, we affirm.

## I. BACKGROUND

This appeal again brings before us the particular talents of one Max 25, a highly trained narcotics detection dog, in order that we may examine the constitutional ramifications of his use as an investigatory medium. On a previous occasion, *United States v. Tartaglia*, 864 F.2d 837 (D.C.Cir. 1989), we held that an "alert" from Max was one of several facts establishing probable cause to believe that a passenger in an Amtrak sleeper compartment possessed narcotics. *Id.* at 842–43. We further held that the ensuing warrantless search of the suspect's roomette was justified under the exigent circumstances exception to the Warrant Clause. *Id.* at 845.

In this case we are called upon to address two questions unresolved by *Tartaglia:* (1) whether, by using Max to sniff a sleeper compartment of an Amtrak train for narcotics from the public corridor, the government agents conducted a search for purposes of the Fourth Amendment; and (2) whether the agents were required to possess some level of suspicion that appellant was trafficking drugs before they could invoke Max's services.

Briefly stated, the salient facts are as follows: On August 7, 1987, appellant aroused the suspicion of an Amtrak drug enforcement unit investigator in Baltimore, Maryland, who was monitoring the computerized reservations list for passengers aboard Amtrak Train 92 en route from Palm Beach, Florida, to New York City via Washington. The investigator observed that Colyer (1) departed from a "source city;" (2) was traveling to a Northeastern "use" city; (3) made his reservation the day before departing; (4) purchased his ticket within a few minutes from the train's scheduled departure; (5) purchased a one-way ticket (when a round-trip ticket costs the same amount); (6) paid the $210 fare with cash; and (7) left a Florida "callback" phone number.

Acting upon his suspicion,[1] the agent phoned the listed number, reaching only a recorded message from an unidentified voice. The agent then contacted the Drug Enforcement Agency, which indicated that Colyer had no criminal record of which it was aware. The agent nevertheless requested that DEA send its detail to Washington's Union Station, where the train was scheduled to stop briefly.

When the train arrived at Union Station, the Amtrak agent, a DEA special agent, and a Maryland Police Department detective were on hand. The detective was accompanied by Max 25, a 1982 graduate (first in his class) of the Maryland Police Department's canine narcotics detection school, trained in detecting marijuana, heroin, and cocaine.[2] Together they boarded

1. The suspicion was derived exclusively from the reservation manifest. At the preliminary hearing, appellant successfully challenged certain statements indicating that Colyer had been observed prior to boarding the train. Appellant's motion for dismissal on this basis is not before us.

2. For further exploits of the canine valedictorian, *see United States v. Treasure,* No. 85–5904 (D.C.Cir.1986) (unpublished op.) (LEXIS, Genfed library, Courts file); *United States v. Rush,* 673 F.Supp. 1097 (D.D.C.1987); *United States v. Carrasquillo,* 670 F.Supp. 49 (D.D.C. 1987), *aff'd,* 877 F.2d 73 (D.C.Cir.1989);

the train and approached the compartment reserved by Colyer. As they did, the agent directed Max toward the eight-by-ten inch mesh ventilation holes of other compartments in order to ensure that Max was not falsely "alerting."

Upon their arrival at appellant's compartment, Max alerted. The investigators then knocked, and when Colyer appeared, they displayed their credentials and asked to see his ticket and identification. Appellant complied. The Amtrak investigator then explained their presence and the alert from Max. He then asked whether appellant would permit the investigators to search Colyer's luggage. Appellant initially denied their request, but when the investigators informed him that failure to consent would cause his removal from the train in order to obtain a search warrant, Colyer acquiesced. The search revealed a green vinyl pouch containing a white powder and a gift-wrapped package containing both white and green powders and loose rice. When asked their nature, appellant confirmed that the white powder was cocaine.

On September 3, 1987, an indictment was issued charging Colyer with possession of cocaine in excess of 500 grams in violation of 21 U.S.C. § 841(a). Appellant pleaded not guilty and filed a pretrial Motion to Suppress Evidence. By memorandum dated October 20, 1987, the District Court denied appellant's motion. *See United States v. Colyer,* Crim. No. 87–0360 (D.D. C. Oct. 21, 1987); Joint Appendix ("J.A.") at 8. Appellant thereafter changed his plea to guilty and on February 24, 1988, filed a notice of appeal to this Court.

## II. ANALYSIS

The First Clause of the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A search within the meaning of the Clause "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (citing, *inter alia, Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968)). *See also Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court for the first time extensively examined the Fourth Amendment implications of a canine sniff.[3] The *Place* Court emphasized that as an investigative procedure, "the canine sniff is *sui generis." Id.* at 707, 103 S.Ct. at 2644. Because it was "aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure," *id.,* the Court held that in the context before it—"exposure of respondent's luggage, which was located in a public place [an airport], to a trained canine"—the sniff was not a search within the meaning of the Fourth Amendment. *Id.*[4]

After noting that a person possesses a privacy interest in his personal luggage, the *Place* Court went on to consider whether a canine sniff impinges that interest:

A "canine sniff" by a well-trained narcotics detective dog ... does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the

---

*United States v. Liberto,* 660 F.Supp. 889 (D.D.C. 1987), *aff'd,* 838 F.2d 571 (D.C.Cir.1988); *United States v. Watson,* 551 F.Supp. 1123 (D.D.C.1982).

3. The Court had earlier encountered a canine sniff, but did not visit its Fourth Amendment implications. *See United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

4. The Court in *Place* ultimately held that while the initial seizure of luggage in order to subject it to the canine sniff was reasonable, "[t]he length of the detention ... precludes the conclusion that the seizure was reasonable in the absence of probable cause." 462 U.S. at 709, 103 S.Ct. at 2645.

sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

462 U.S. at 707, 103 S.Ct. at 2644.

■ By the same token, our inquiry does not end with the recognition that Colyer possessed a privacy interest in his sleeper compartment. *Place* requires that we consider the minimal intrusion occasioned by the canine sniff, as "no other investigative procedure ... is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.* *See also Smith v. Maryland,* 442 U.S. 735, 741, 99 S.Ct. 2577, 2581, 61 L.Ed.2d 220 (1979) (noting that under *Katz v. United States,* "it is important to begin by specifying precisely the nature of the state activity that is challenged").

In so doing, we recognize that we must apply these principles in a different context—a sniff of the exterior of an Amtrak roomette rather than of personal luggage. As the Second Circuit recognized in *United States v. Thomas,* 757 F.2d 1359, 1366 (2d Cir.1985), "[i]t is one thing to say that a sniff in an airport is not a search, but quite another to say that a sniff can *never* be a search." Thus, "[t]he question always to be asked is whether the use of a trained dog intrudes upon a legitimate expectation of privacy." *Id.* (citing *Katz,* 389 U.S. 347, 88 S.Ct. 507). *See also United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977) (the Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy").

## A. *Legitimacy of Privacy Expectation*

Our Fourth Amendment inquiry focuses on the legitimacy of Colyer's expectation of privacy, and whether the sniff dashed any such legitimate expectation. While our determination must be informed by the teachings of the Supreme Court on this subject, there is no talisman that determines the privacy expectations that society deems reasonable; rather, the Court has given weight to a variety of factors. *See Oliver v. United States,* 466 U.S. 170, 177–78, 104 S.Ct. 1735, 1740–41, 80 L.Ed.2d 214 (1984).

The legitimacy of one's expectation of privacy "by definition means more than a subjective expectation of not being discovered." *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978). *See also Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). "The test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver,* 466 U.S. at 182–83, 104 S.Ct. at 1744. *See also Rakas,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12 (legitimation of such expectations must derive from concepts of property law or understandings that are societally recognized and permitted).

The Supreme Court has indicated on at least two occasions that the ability of an investigative technique to reveal only items in which the subject has no legitimate expectation of privacy—and no other arguably private fact—bears heavily on whether the procedure has effected a search. In *Place,* a canine sniff was held not to be a search, in part because it did "not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage.... Moreover, the [dog] sniff disclose[d] only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff [told] the authorities something about the contents of the luggage, the information obtained [was] limited." 462 U.S. at 707, 103 S.Ct. at 2644.

The Court expanded this analysis in *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), hold-

ing that a chemical field test that "merely disclose[d] whether or not a particular substance is cocaine" was not a search within the meaning of the Fourth Amendment. *Id.* at 123, 104 S.Ct. at 1662. Central to this conclusion was the Court's judgment that such a procedure could impinge no legitimate privacy interest. Congress had decided "to treat the interest in 'privately' possessing cocaine as illegitimate." · *Id.* Therefore, "governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." *Id.* (footnote omitted). Such a procedure, revealing as it does only the presence or absence of contraband, "does not compromise any legitimate interest in privacy," and even a negative result "reveals nothing of special interest." *Id.*

As in *Place,* the driving force behind *Jacobsen* was the recognition that because of the binary nature of the information disclosed by the sniff, no legitimately private information is revealed: That is, "the governmental conduct could reveal nothing about noncontraband items." *Id.* at 123, 124 n. 24, 104 S.Ct. at 1661, 1662 n. 24. *See also* 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.2(d), at 349 (2d ed. 1987) (concluding that "a merchant's use of a sensormatic detection system, which will alert *only* to tags on the store's merchandise when they are being removed from the store, is not a search because there is no *justified* expectation in successful shoplifting"); *cf. Florida v. Riley,* — U.S. —, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (holding that a helicopter flyover to confirm a tip that marijuana was being grown in a greenhouse

was not a search within the meaning of the Fourth Amendment, in part because "no intimate details connected with the use of the home or curtilage were observed").[5]

■ In our view, then, *Place* and *Jacobsen* stand for the proposition that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. Stated otherwise, governmental conduct that can "reveal nothing about noncontraband items," *Jacobsen,* 466 U.S. at 124 n. 24, 104 S.Ct. at 1662 n. 24, interferes with no legitimate privacy expectation. Unlike the majority in *Jacobsen,* in *Place* the Court did not rely exclusively on this reasoning; the Court also stressed the unintrusive manner in which the information was obtained, noting, *inter alia,* that the owner of the luggage was not subjected to embarrassment or inconvenience. *See* 462 U.S. at 707, 103 S.Ct. at 2644. We now shift our attention to the particular circumstances under which the sniff was conducted in the present case in order to determine whether we are presented with facts that take the present case outside the ambit of *Place.*

## B. *Manner and Location of Sniff*

■ Appellant argues that *Place* is inapposite in the context of a sniff of a sleeper car rather than of luggage located in a public place. Brief for Appellant at 20–21 (quoting *Place,* 462 U.S. at 707, 103 S.Ct. at 2644). To begin with, the public-private contrast that appellant urges is unconvincing, as appellant admits that the sniff of the compartment was conducted from a public corridor. *See id.* at 21. Thus, to the extent that *Place*'s application is in ques-

---

**5.** *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), does not detract from this analysis. In *Karo,* the Supreme Court held that the "beeper surveillance" of a container of ether (which could be used to extract cocaine from clothing) within a home constituted a search within the ambit of the Fourth Amendment. Ether is not contraband and its mere possession is entirely lawful. Moreover, the beeper revealed only the *location,* not the contents, of the container. Thus, *Karo* is factually distinct from both *Place* and *Jacobsen,* where the procedure disclosed only the presence or absence of a contraband item. *See*

*Place,* 462 U.S. at 707, 103 S.Ct. at 2644; *Jacobsen,* 466 U.S. at 122, 104 S.Ct. at 1661. Finally, the conduct challenged in *Karo* revealed activities within the subject's home, and, as we discuss *infra,* the Court has long maintained that a home dweller typically enjoys an enhanced expectation of privacy. To the extent that the "beeper" cases have relevance, which we emphasize is marginal, *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), is the more relevant. In *Knotts,* the Court held that the surveillance of a container being transported by automobile was not a search.

tion, it appears that the relevant inquiry is whether *Place* governs a sniff of a sleeper compartment as opposed to personal luggage.

We agree with appellant that the question is not whether the sleeper compartment was somehow "private space" in the abstract, but instead whether Colyer's reasonable expectations were invaded by the search. *See* Brief for Appellant at 11. The Supreme Court has recognized that one's expectation of privacy and his whereabouts are closely linked. Contrary to appellant's assertion, this does not mean that a person enjoys "absolute protection within his home," Brief for Appellant at 12, for he does not. *Cf. Katz,* 389 U.S. at 351, 88 S.Ct. at 511 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Nor does it mean that a person relinquishes all reasonable expectations of privacy in a public place, for he does not. *Cf. O'Connor v. Ortega,* 480 U.S. 709, 717, 107 S.Ct. 1492, 1498, 94 L.Ed. 2d 714 (1987) (plurality opinion) ("we reject the contention ... that public employees can never have a reasonable expectation of privacy in their place of work"). Rather, it means that although "the Fourth Amendment protects people, not places," *Katz,* 389 U.S. at 351, 88 S.Ct. at 511, and a person is entitled to remain free from unreasonable searches "[w]herever [he] may be," *id.* at 359, 88 S.Ct. at 515, the ascertainment of the scope of the "protection it [the Fourth Amendment] affords to those people ... requires reference to a 'place.' " *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). *See also O'Connor,* 480 U.S. at 719, 107 S.Ct. at 1499 ("Because the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context, it is essential first to delineate the boundaries of the [area searched].").

Appellant likens his Amtrak roomette to a hotel room or apartment, relying on testimony that the compartment is "like a very small type of bedroom," is "basically isolated from the rest of the cars," and is "similar to ... a small, miniature hotel type of thing." Brief for Appellant at 12, J.A. 31.

A sleeper car does indeed possess several indicia of a dwelling; but then again, so does a motor home, which, the Supreme Court has held, falls within the ambit of the automobile exception to the Warrant Clause. *See California v. Carney,* 471 U.S. 386, 392, 105 S.Ct. 2066, 2069, 85 L.Ed. 2d 406 (1985). Furthermore, although appellant argues that the expectation of privacy is higher in a roomette than in an automobile, Brief for Appellant at 15, we recently rejected this argument in a similar context. *See United States v. Tartaglia,* 864 F.2d at 841 (discussing with approval *United States v. Liberto,* 660 F.Supp. 889 (D.D.C.1987), *aff'd,* 838 F.2d 571 (D.C.Cir. 1988)); *see also Liberto,* 660 F.Supp. at 891 ("the use of a police dog in the public corridor of the train to corroborate independent suspicion of narcotics trafficking does not constitute an unreasonable search in violation of the fourth amendment").

Appellant's reliance on *United States v. Thomas,* 757 F.2d 1359 (2d Cir.1985), is unavailing. In *Thomas,* the Court of Appeals for the Second Circuit held that the use of a canine to sniff outside a suspect's apartment was a search, and because it was conducted without a warrant, violated the Fourth Amendment. *Id.* at 1367. As an initial matter, the very correctness of the *Thomas* decision is called into question by its assertion that the defendant "had a legitimate expectation that the contents of his closed apartment would remain private." *Id.* As was shown above, the Supreme Court's analyses in *Place* and *Jacobsen* indicate that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. No legitimate expectation of privacy is impinged by governmental conduct that can "reveal nothing about noncontraband items." *Jacobsen,* 466 U.S. at 124 n. 24, 104 S.Ct. at 1662 n. 24.

Yet, even if we assume that *Thomas* was correctly decided and that it is binding upon us, which it is not, it would by no means compel the conclusion that the sniff in question constituted a search. It is clear that the Second Circuit rested its decision on the "heightened privacy interest an indi-

vidual has *in his dwelling place.*" *Thomas,* 757 F.2d at 1366 (emphasis added). *See also id.* at 1367 ("Because of defendant['s] heightened expectation of privacy inside his dwelling, the canine sniff at his door constituted a search."). The Supreme Court has long stressed that the heightened expectation of privacy enjoyed by those in their home finds its moorings in " 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.' " *Oliver v. United States,* 466 U.S. at 178, 104 S.Ct. at 1741 (quoting *Payton v. New York,* 445 U.S. 573, 601, 100 S.Ct. 1371, 1388, 63 L.Ed. 2d 639 (1980); other citations omitted). While an Amtrak sleeper car may in some ways resemble a residence, it enjoys no such status in the law. Absent similar underpinnings, equal treatment would be gratuitous. *Cf. United States v. Martinez–Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) ("one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence") (citations omitted).

On this point we also find instructive the Fourth Circuit's recent pronouncement in *United States v. Whitehead,* 849 F.2d 849 (4th Cir.1988). That court rejected appellant's contention that an Amtrak sleeping compartment "is a 'temporary home' for fourth amendment purposes," *id.* at 853, and noted that "the Supreme Court has consistently [ ] affirmed that the privacy interests of individuals engaged in transit on public thoroughfares are substantially less than those that attach to fixed dwellings." *Id.* at 854 (citing, *inter alia, Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066).

It might also be argued that *Place* is distinguishable in that the luggage searched there was totally removed from the suspect's presence; temporary control was totally relinquished in favor of the carriers. *See* 1 W. LaFave, *supra,* § 2.2(f), at 373 (noting that *Place* "addresses only the situation of exposure of luggage to the dog in the suspect's absence"). A similar concern was addressed in *United States v. Beale,* 736 F.2d 1289 (9th Cir.) (*en banc*), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), where the Court of Appeals for the Ninth Circuit found it important that in both *Place* and *Jacobsen* the Supreme Court approved investigative techniques that did not require contact with the owner of the items being searched. *Id.* at 1291. Here, as in *Beale,* "we are not confronted with a case in which the detection dog conducted a sniff of a person rather than an inanimate object, or a sniff of luggage that a person was carrying at the time." *Id.* (footnotes omitted). Furthermore, here, as there, the sniff "caused 'virtually no annoyance and rarely even contact with the owner of the bags, unless the [test result] is positive.' " *Id.* (quoting *United States v. Waltzer,* 682 F.2d 370, 373 (2d Cir.1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983)). *See also Terry,* 392 U.S. at 15, 88 S.Ct. at 1876 (the Fourth Amendment imposes upon the courts the "responsibility to guard against police conduct which is overbearing or harassing"). We find these concerns much more compelling than the simple fact that in both *Place* and *Jacobsen* the items searched were totally removed from their owners' possession. To the extent that it is relevant, the distinction is subsumed by these more compelling considerations.[6]

Not only do the authorities and the text of the Fourth Amendment convince us that the canine sniff in question was not a search for Fourth Amendment purposes, to

---

**6.** We are not here confronting the scenario lamented by Justice Brennan in his dissent in *Jacobsen, i.e.,* the situation where "law enforcement officers could release a trained cocaine-sensitive dog ... to roam the streets at random, alerting the officers to people carrying cocaine." *Jacobsen,* 466 U.S. at 138, 104 S.Ct. at 1669

(Brennan, J., dissenting) (citation omitted). Whether such face-to-face canine/person confrontations would constitute a search or seizure, or whether there might be other infirmities with such a practice, are questions we reserve for another day.

hold otherwise would raise an untoward specter of litigation against the investigators by those subjected to the canine's wandering nose. Substantive Fourth Amendment rules are enforceable, to some extent, by civil actions against offending officers. *See Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (action against federal officers); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (state officers sued under 18 U.S.C. § 1983). In the context of the present case, if we were to hold that the corridor sniff were a search, those whose sleeper cars were sniffed in order to ensure that Max 25 was not falsely "alerting"—and of whom the agents had no reason to suspect possession of illicit drugs—could maintain a civil action, although no information pertaining to their private affairs was obtained, and neither they nor their belongings were seized.

In sum, because Max's sniff "d[id] not expose noncontraband items that otherwise would remain hidden from view," and was not conducted in a manner or location that subjected appellant "to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods," *Place,* 462 U.S. at 707, 103 S.Ct. at 2644, we conclude that the *Place*-enunciated rule governs, and, thus, no search occurred.

## C. *Reasonable Suspicion under* Terry

■ Appellant argues that even if the sniff was "not a search requiring probable cause," the summoning of Max 25 itself required a predicate showing of reasonable and articulable suspicion. Brief for Appellant at 26. Noting that "[t]his intermediate standard of an articulable suspicion [was] created by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)," *id.,* appellant argues that Max's sniff should be subjected to "some level of Fourth Amendment scrutiny." *Id.*

Because we have determined that no search occurred, the Fourth Amendment is not implicated, and we need inquire no further. *See* J. HALL, SEARCH AND SEIZURE § 1:1, at 3–4 (1982) (footnotes omitted); *see*

*also United States v. Goldstein,* 635 F.2d 356, 361 (5th Cir.) (holding that because the challenged canine sniff did not constitute a search, reasonable suspicion is not required), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981); *Arizona v. Hicks,* 480 U.S. 321, 328, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987) ("a truly cursory inspection ... is not a 'search' ... and therefore does not even require reasonable suspicion").

Nonetheless, if the dog sniff outside the roomette in some sense constituted a search, that search may be upheld despite the lack of probable cause. While we are satisfied that the minimally intrusive and binary nature of the canine sniff render it not a search, there is some authority for the proposition that there is a category of search known to the law which because of its minimally intrusive nature is supportable on the basis of reasonable suspicion rather than probable cause.

In his concurring opinion in *Place,* Justice Blackmun suggested that "a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under *Terry* upon a mere reasonable suspicion." 462 U.S. at 723, 103 S.Ct. at 2653 (Blackmun, J., concurring in judgment). We find ourselves hard pressed for authority from the Supreme Court to support Justice Blackmun's underlying premise—that there is a category of "minimally intrusive" searches that are supportable under *Terry* on less than probable cause.

It is certainly true that the Supreme Court has upheld a wide variety of searches on less than probable cause as traditionally understood, but in no case was a law-enforcement search denominated "minimally intrusive." Indeed, the Supreme Court's opinion in *Arizona v. Hicks* may indicate that the contrary is the case, *i.e.,* that the Fourth Amendment knows no search but a "full-blown search." *Hicks,* 480 U.S. at 328, 107 S.Ct. at 1154 ("A search is a search, even if it happens to disclose nothing but the bottom of a turntable."). *Compare id. with id.* at 333, 107 S.Ct. at 1157 (O'Connor, J., dissenting) ("distin[guishing] between searches based

on their relative intrusiveness ... is entirely consistent with our Fourth Amendment jurisprudence").

Rather than interpreting *Terry* as broad authority for the proposition that minimally intrusive searches may be justified on the basis of reasonable suspicion, the Supreme Court has on several occasions limited *Terry* to its precise underpinnings, *i.e.*, protective searches for weapons. *See Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2250, 60 L.Ed.2d 824 (1979) (*Terry* is directed to "limited, on-the-street frisk[s] for weapons."). Indeed, the Court has gone so far as to say that *Terry* provides no support for "any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979). *See also Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (per curiam); *Sibron v. New York*, 392 U.S. 40, 64–65, 88 S.Ct. 1889, 1903–04, 20 L.Ed.2d 917 (1968) ("The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man."). Thus, Professor LaFave seems correct in concluding that "there is no search-for-evidence counterpart to the *Terry* weapons search, permissible on only a reasonable suspicion that such evidence would be found." 3 W. LaFave, *supra*, § 9.4(g), at 539.

However, *Terry* does represent one of a lengthy line of cases in which the Supreme Court has upheld a search or seizure "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause." *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). *See generally* Sundby, *A Return to Fourth Amendment Basics: Undoing the Mischief of* Camara *and* Terry, 72 Minn.L.Rev. 383, 395 (1988) (*Terry* "enthron[ed] the reasonableness balancing test") (initial capitalization omitted). Yet a careful reading of the Supreme Court's teachings leaves us doubtful that "reasonableness balancing"

is appropriate in the context of the present case. Five times in as many years the Court has indicated that balancing is only appropriate when warranted by "special needs, beyond the normal need for law enforcement." *See Skinner v. Railway Labor Executives' Assoc.*, —— U.S. ——, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) (citation omitted); *National Treasury Employees Union v. Von Raab*, —— U.S. ——, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989); *Griffin v. Wisconsin* 483 U.S. 868, 107 S.Ct. 3164, 3167, 97 L.Ed.2d 709 (1987); *O'Connor v. Ortega*, 480 U.S. at 719–20, 107 S.Ct. at 1499; *New Jersey v. T.L.O.*, 469 U.S. at 351, 105 S.Ct. at 747 (Blackmun, J., concurring in judgment).

This interpretation explains the various cases in which the Supreme Court has held searches to be lawful despite the absence of probable cause as traditionally understood. *See T.L.O.*, 469 U.S. 325, 105 S.Ct. 733 (search by school official of student's purse); *O'Connor*, 480 U.S. 709, 107 S.Ct. 1492 (work-related search by governmental employer); *Griffin*, 483 U.S. 873–74, 107 S.Ct. at 3168 (search of probationer's home); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (housing inspections); *New York v. Burger*, 479 U.S. 812, 107 S.Ct. 61, 93 L.Ed.2d 20 (1987) (inspections of highly regulated business premises); *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (inspections of underground mines); *Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979) (body cavity searches of prison inmates); *United States v. Brignoni–Ponce*, 422 U.S. 873, 880–81, 95 S.Ct. 2574, 2579–80, 45 L.Ed.2d 607 (1975) (border patrols); *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972) (inspections of "pervasively regulated business" for compliance with Gun Control Act); *Terry*, 392 U.S. 1, 88 S.Ct. 1868 (search for weapons, to protect officer and public). In no case has the Supreme Court indicated that a search for evidence *qua* evidence might qualify as a "special need" that would warrant reasonableness balancing. Common sense suggests that it is not.

To be sure, the Supreme Court has upheld on reasonable suspicion a variety of "minimally intrusive" *seizures* in contexts different from the "stop and frisk" originally approved in *Terry*. In such cases, the " 'seizures' [were] so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test." *Dunaway v. New York*, 442 U.S. at 210, 99 S.Ct. at 2255. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) (investigative stop of vehicle); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (random checks for drivers' licenses and vehicle registration); *United States v. Brignoni-Ponce*, 422 U.S. at 880–81, 95 S.Ct. at 2579–80 (brief investigative stop of motorists near border for questioning; analogizing situation to encounter addressed in *Terry*); *see also United States v. Villamonte-Marquez*, 462 U.S. 579, 592, 103 S.Ct. 2573, 2581, 77 L.Ed.2d 22 (1983) (random seizure of vessel in order to examine manifest); *United States v. Martinez-Fuerte*, 428 U.S. at 560, 96 S.Ct. at 3084 (brief random checkpoint questioning for aliens). Although there may be no compelling reason to differentiate between seizures on the basis of their intrusiveness and failing to likewise differentiate between types of searches, the fact remains that we are unable to point to a single Supreme Court case that has upheld a search on reasonable suspicion merely because it was minimally intrusive. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *cf. Martinez-Fuerte*, 428 U.S. at 561, 96 S.Ct. at 3084 (upholding as reasonable a random seizure and noting that it was not dealing with a search).

But if we assume the correctness of Justice Blackmun's suggested rationale in his *Place* concurrence, then Max's sniff, if it was a search at all, constituted such a minimally intrusive search. Indeed, two of our sister circuits have held that a dog sniff, at least under some circumstances, constitutes a minimally intrusive search supportable on reasonable suspicion. *Horton v. Goose Creek Indep. School Dist.*, 690 F.2d 470 (per curiam), *petition for reh'g en banc denied*, 693 F.2d 524 (5th Cir.1982) (sniff of school children); *United States v. Whitehead*, 849 F.2d at 857 (sniff of railway roomette on facts similar to those of the present case). For the reasons we now explain, Max's sniff was likewise supported by reasonable suspicion that appellant illegally possessed drugs.

As we reviewed earlier, on the day of appellant's arrest, the Amtrak drug enforcement unit investigator observed from Colyer's reservation that he (1) departed from a "source city;" (2) was traveling to a Northeastern "use" city; (3) made his reservation the day before departing; (4) purchased his ticket within a few minutes from the train's scheduled departure; (5) purchased a one-way ticket (when a round-trip ticket costs the same amount); (6) paid the $210 fare with cash; and (7) left an in-service Florida "callback" phone number.

Although the parties treat this as a "drug courier profile" case, it appears from a careful reading of the agent's testimony that rather than mechanically matching appellant's reservation with a profile, he selected those manifests which, on the basis of his training and experience, appeared suspicious. *See* Suppression Hearing Transcript ("Tr.") 19–21. We thus have no occasion to consider whether the correspondence of a suspect's conduct to a pre-established "profile" would alter our analysis. *Cf. United States v. Sokolow*, — U.S. —, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) ("We do not agree with respondent that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's 'drug courier profiles.' ").

In order for a police intrusion to be supportable under *Terry*, it must be based on "specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. The suspicion must be based on

more than an "inchoate and unparticularized suspicion or 'hunch'" of wrongdoing, *id.* at 27, 88 S.Ct. at 1883, and must be supported by "specific, objective facts." *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). Although the terms used "to capture the elusive concept" of reasonable suspicion "are not self-defining," *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), the Supreme Court has made clear that we are to look to "'the totality of the circumstances—the whole picture,'" to determine whether the facts, taken together, amount to reasonable suspicion. *Sokolow,* — U.S. —, 109 S.Ct. at 1585 (quoting *Cortez,* 449 U.S. at 417, 101 S.Ct. at 694). *See also New Jersey v. T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742. The appropriate level of suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence," *Sokolow,* — U.S. —, 109 S.Ct. at 1585, and is, quite obviously, "less demanding" than the showing required for probable cause, *i.e.,* "'a fair probability that contraband or evidence of a crime will be found.'" *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2323, 76 L.Ed.2d 527 (1983)).

We view the facts from the perspective of an experienced officer, who because of his experience may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Brown,* 443 U.S. at 52 n. 2, 99 S.Ct. at 2641 n. 2. *Accord Cortez,* 449 U.S. at 418, 101 S.Ct. at 695 ("a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person"); *U.S. v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (Powell, J., concurring); *Terry,* 392 U.S. at 33, 88 S.Ct. at 1886. "Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices." *Mendenhall,* 446 U.S. at 563, 100

S.Ct. at 1882 (Powell, J., concurring). Thus, to the extent that the Amtrak agent relied on his knowledge of "the modes or patterns of operation of certain kinds of lawbreakers," our analysis should take this into account. *See Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

In the present case, unlike the most analogous Supreme Court authority, we are presented with no facts which independently support an inference of wrongdoing. On the three occasions where the Supreme Court has held that correspondence of a suspect's behavior with a drug courier profile created reasonable suspicion, it has relied on facts that were in themselves, at least to some degree, incriminating. *See Sokolow,* — U.S. —, 109 S.Ct. at 1586 (reason to believe suspect traveling under alias); *Florida v. Rodriguez,* 469 U.S. 1, 3, 105 S.Ct. 308, 309, 83 L.Ed.2d 165 (1984) (per curiam) (suspects glancing over shoulders and overheard saying "Let's get out of here"); *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (suspect "was traveling under an assumed name"); *see also Mendenhall,* 446 U.S. at 564, 100 S.Ct. at 1882 (plurality opinion) (suspect observed to be "very nervous" and acting furtively). In the present case, by contrast, the agent derived his suspicion entirely from facts which were suspicious, if at all, only when viewed in the aggregate. Nevertheless, we do not believe that this alone compels that we find reasonable suspicion lacking. So long as the "evidentiary significance" of "'the totality of the circumstances—the whole picture'" indicates that appellant was transporting illegal drugs, *Sokolow,* — U.S. —, 109 S.Ct. at 1587, 1585 (quoting *Cortez,* 449 U.S. at 417, 101 S.Ct. at 694), we cannot conclude that the existence of a single independently suspicious item of behavior is a *sine qua non* of reasonable suspicion.

With these principles in mind, we conclude that the information contained in appellant's computerized reservation presented the trained and experienced agent[7] with

---

7. Appellant does not challenge the agent's expertise in drug interdiction, which included seven-

teen years of police service and specific training and experience in detecting drug trafficking.

sufficient information reasonably to suspect appellant of trafficking illegal drugs. *First,* the agent found significant the fact that appellant traveled between Palm Beach and New York. Although appellant is surely correct that such travel "cannot be considered a characteristic of criminality," Reply Brief at 3, he overstates the significance ascribed by the agent to the source/use city information. The agent's testimony made clear that this fact was only the starting point for his investigation. *See* Tr. at 19. It seems obvious to us, as Professor LaFave pointed out, that "the fact that the traveler has come from a 'major source city' is of *some* significance" in establishing reasonable suspicion. 3 W. LaFave, *supra,* § 9.3(c), at 445. *See also United States v. Sharpe,* 470 U.S. at 682 n. 3, 105 S.Ct. at 1573 n. 3 (vehicles traveling "in an area near the coast known to be frequented by drug traffickers").

*Second,* the agent testified that appellant's reservation aroused his interest because it indicated that Colyer purchased his ticket only seven minutes before the train's scheduled departure. He testified that "this is one of the criteria we look for." Tr. at 27. Logic suggests that because a drug courier might attempt to limit the period in which he might be observed at the station, a brief interval between the time a ticket is purchased and the train's scheduled departure may with other circumstances give rise to suspicion. Appellant contends that this circumstance should have raised no suspicion in the present case, as he in fact arrived at the station 40 minutes before the train was scheduled to depart, was forced to wait in line for approximately 25 minutes, and, in any event, the train's arrival was delayed by 17 minutes. As an initial matter, there is no evidence in the record to support appellant's claim of early arrival. Even if true, appellant's apparent premise—that a fact unknown to the investigating officer can negate suspicion reasonably supported by facts known—would appear to transform the inquiry in the *Terry* line of cases. In *Sokolow,* for example, upon discovery that

Sokolow was traveling under the name "Kray," the officers were not required to dispel Sokolow's contention that he was traveling upon his mother's maiden name. It was enough that "the agents had a reasonable ground to believe that [Sokolow] was traveling under an alias; the evidence was by no means conclusive, but it was sufficient to warrant consideration." — U.S. ——, 109 S.Ct. at 1586 (footnote omitted). The same is true in the present case. While a desire to avoid observation is certainly not the only reason one would purchase a ticket so near the train's departure, there are logical reasons for believing that a drug courier might purchase his ticket as near as possible to the scheduled departure of the train. As such, this fact "warrant[ed] consideration."

■ *Third,* the agent thought it significant that appellant purchased a one-way ticket to New York while leaving an in-service Florida callback number. The Supreme Court has considered among the factors establishing reasonable suspicion the suspect's cash payment for a one-way ticket. *Royer,* 460 U.S. at 502, 103 S.Ct. at 1326 (plurality opinion). In this case, the purchase of a one-way ticket is more telling than in *Royer* because it is undisputed that appellant could have purchased a round-trip ticket for exactly the same amount. It is true, as appellant points out, that the Amtrak agent *did not take steps beyond* calling the listed number to verify appellant's phone number. Appellant contends that had the agent inquired further, his suspicion would have been allayed because the phone was fully operational and listed in appellant's name. It is readily apparent that appellant misapprehends the basis of the agent's suspicion. Had the agent done further checking and discovered that the given callback number was in fact appellant's (there is nothing in the record on this point), he would then have confirmed the basis of his suspicion—it would appear rather unusual for a one-way traveler to desert an in-service phone listed in his name, and especially so when a round-trip

See Tr. 13–15; *see also Rodriguez,* 469 U.S. at 6, 105 S.Ct. at 311 (recounting officers "special

training in narcotics surveillance and apprehension").

ticket was identically priced. Although appellant may be "like tens of thousands of 'snowbirds' (one who lives north during the summer months and south in the winter)," Reply Brief at 3, the existence of innocent explanations for ambiguous conduct does not necessarily dispel the suspicion that may reasonably arise from travel arrangements that are out of the ordinary. *Cf. Sokolow,* ——— U.S. ———, 109 S.Ct. at 1586.

*Fourth,* appellant, like the suspects in both *Royer* and *Sokolow,* paid cash for his tickets. In this regard, the instant case, involving a $210 purchase, undoubtedly presents a less incriminating scenario than existed in *Sokolow,* where the suspect paid $2,100 in cash for his tickets from a roll of $20 bills twice as large. ——— U.S. ———, 109 S.Ct. at 1586. But in *Royer* the Court determined that a cash payment was probative without discussing either the price of the ticket or the denomination of the bills. 460 U.S. at 502, 103 S.Ct. at 1326. It seems quite reasonable to us that officers trained in the modes or patterns of drug trafficking place particular emphasis on cash transactions, as cash payment, unlike payment by credit card, is particularly suitable for traveling under an assumed name. Appellant's response—that this justification "does not reconcile the fact that Mr. Colyer reserved the ticket in his true name and left his correct telephone number," Reply Brief at 4 n. 1—is misplaced, as these facts were, at the time of the sniff, unknown to the officers. Under these circumstances, appellant's cash payment reasonably warranted some consideration.

■ Appellant points out that "[i]n virtually every case involving [the reasonable suspicion] standard the suspect has been visually observed prior to the investigative stop." On this basis he argues that "[n]o such suspicion existed in this case … for the simple reason that the government never *saw* Mr. Colyer." Brief of Appellant at 36–37. Although it is certainly true that the suspects were visually observed in *Sokolow, Rodriguez, Royer,* and *Mendenhall,* we do not believe that direct visual observation is an irreducible element of reasonable suspicion. As is true with probable cause, reasonable suspicion "turn[s] on the assessment of probabilities in particular factual contexts;" as such, "[r]igid legal rules are ill-suited to an area of such diversity." *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329. Thus, in the circumstances of the present case, we cannot conclude that the failure to directly observe Colyer is determinative.

Of the Supreme Court's "profile" cases, only in *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), did it find that the facts failed to demonstrate a reasonable basis for suspecting Reid of trafficking illegal drugs. There, four facts were presented as creating reasonable suspicion: departure from a source city, early morning arrival, shoulder bags as only luggage, and attempted concealment of companionship with another passenger. The Court held that the collection of facts was inadequate; the first three facts "describe a very large category of presumably innocent travelers who would be subject to virtually random seizures." *Id.* at 441, 100 S.Ct. at 2754. The fourth fact, relating to Reid's personal conduct, was by itself "simply too slender a reed to support the seizure." *Id.* In the present case, the Amtrak agent testified that his investigations would typically reveal no more than three suspicious reservations on a 400–seat train. Tr. at 20. To the extent that the *Reid* Court was disturbed by profiles that were overly inclusive, casting a net over "a very large category of presumably innocent travelers," the concern would seem inapposite in the context of the present case, where the investigatory technique implicated such a small percentage of travelers.

Thus, the facts known to the agent were sufficient to create a reasonable suspicion that appellant was transporting illegal drugs. In so holding, we recognize that none of the facts disclosed by the reservation independently proved any illegal conduct, and that each fact or all cumulatively might be consistent with innocent travel. This alone does not compel a conclusion that reasonable suspicion was lacking; indeed, the same was true in *Sokolow,* where the Supreme Court found that the agents

derived reasonable suspicion from facts "quite consistent with innocent travel." — U.S. ——, 109 S.Ct. at 1586.[8] As the Court there made clear, in determining whether reasonable suspicion was present, " 'the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' " *Id.* at 1587 (quoting *Illinois v. Gates,* 462 U.S. at 243–44, 103 S.Ct. at 2334–35). And while it is certainly true that even when viewed cumulatively the facts in the present case fall short of establishing that it was more likely than not that appellant was trafficking drugs, *Sokolow* specifically instructed that this is not the relevant standard. *Id.* at 1585.

In summary, we have held in Part I that Max's sniff was not a search, so that neither probable cause nor reasonable suspicion was required. If we erred in that holding, we still do not find that the District Court wrongly admitted the evidence. For, while we stop short of embracing the position that the Constitution knows a category of minimally intrusive search for no other than law enforcement purposes, we conclude that if such a category exists, and if the present dog sniff constituted a search, it could only be a search of that sort. That is to say, this minimally intrusive investigative technique can constitute a search only if such a category of search does exist. Because reasonable suspicion was present here, no violation of Colyer's constitutional rights occurred, even in that context.

### D. *Probable Cause for Ultimate Search of Bags*

 We agree with appellant that if Max's sniff was an unlawful search, it could not serve as a basis for establishing probable cause for the ultimate seizure and search of his bags. *See* Brief for Appellant at 11. However, because we have concluded that the sniff was lawful, there can be little doubt that, when combined with the information obtained from the computer manifest, probable cause existed. *See United States v. Liberto,* 660 F.Supp. at 891–92 ("once Max had 'alerted' to the narcotics in the defendant's suitcase, it can not be denied that the officers had probable cause to believe that the luggage contained illicit drugs").[9] Moreover, the virtual identity of the facts in the present case to those in our recent decision in *Tartaglia,* 864 F.2d at 839–40, requires that we find present sufficiently exigent circumstances to justify an exception to the Warrant Clause. *See id.* at 842–43 (holding that it was not unreasonable for police to conclude that no warrant could be obtained in the 25 minutes remaining before the train's scheduled departure).

### III. Conclusion

For the reasons set forth above, we conclude that based on the totality of the circumstances presented, both probable cause and exigent circumstances existed such that the warrantless search of appellant's bags was lawful. The District Court therefore properly denied appellant's Motion to Suppress. The judgment of the District Court is accordingly

Affirmed.

**8.** In *Sokolow* it was known that:
> (1) [Sokolow] paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

109 S.Ct. at 1583.

**9.** Although a search lacking the requisite level of suspicion may nevertheless be upheld based on lawful consent, in light of our holding we have no occasion to reach the question of whether Colyer's acquiescence to the search of his bags in the face of the threat of removal from the train constituted effective consent.