**UNITED STATES of America**

v.

**Ronald J. TARTAGLIA, Jr., Appellant.**

No. 87–3079.

United States Court of Appeals, District of Columbia Circuit.

Argued May 5, 1988.

Decided Jan. 6, 1989.

As Amended Jan. 6, 1989.

David N. Cicilline, Providence, R.I., was on the brief, for appellant.

Michael W. Farrell, Mary Ellen Abrecht, Betty Ann Soiefer, Washington, D.C., Oliver W. McDaniel, Asst. U.S. Attys., Jay B. Stephens, U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before EDWARDS and WILLIAMS, Circuit Judges, and OBERDORFER,* District Judge.

Opinion for the Court filed by District Judge OBERDORFER.

OBERDORFER, District Judge:

On February 24, 1987, defendant Ronald J. Tartaglia was arrested at Union Station in Washington, D.C. and subsequently indicted on a charge of possession with intent to distribute cocaine. A police detail had found and seized an incriminating quantity of cocaine when, without a warrant, they entered a roomette occupied by defendant in an Amtrak train's passenger car standing in Union Station. The train had stopped in Washington en route from Miami, Florida to New York City. The District Court denied defendant's motion to suppress the evidence so seized on the alternate grounds that (1) the warrantless search of defendant's roomette and knapsack was based upon probable cause stemming from police observations and the reaction of a well-trained, qualified narcotics detection dog while it sniffed at the door of the roomette; (2) the search could be regarded as a *Terry* stop based on reasonably suspicious circumstances arising from police scrutiny of a passenger list before the train departed from Miami; (3) an extension of the so-called "automobile exception" to the warrant requirement of the Fourth Amendment justified the warrantless search; and (4) the imminent departure of the train pending issuance of a warrant and the difficulty of delaying the train

---

* Of the United States District Court for the District of Columbia sitting by designation pursuant to 28 U.S.C. § 292(a).

were exigent circumstances which justified the warrantless search and seizure. The District Court not only found that there was probable cause to justify a search, but also specifically found that it was "practically impossible to get a warrant for a person on board a train which is only going to stop for 25 minutes." Transcript of Motion to Suppress held on May 21, 1987, ("Tr."), at 55a. Thereupon, defendant pled guilty pursuant to stipulation which allowed him to appeal the denial of his motion to suppress. After sentence, defendant appealed. Appellant argues here that the trial court erred in relying on the "exigent circumstances exception" and on the "automobile exception" to excuse the warrant requirement of the Fourth Amendment. We affirm because we are satisfied that the record here portrays exigent circumstances that fully justify the District Court's denial of the motion to suppress.

## I.

The investigation leading to the search, seizure, and arrest evolved incrementally. Amtrak officials, aware of the use of Amtrak facilities by drug couriers travelling from South Florida to drug sources in the Northeast corridor markets, have created a Drug Interdiction Unit. Experience with detection of drug couriers who use Amtrak service has established characteristics of those couriers: "[u]nusual nervousness, travelling from a source city, paying cash for a ticket, unusual itinerary, associating with a known drug trafficker, making a call to a pay phone upon deplaning, travelling under a false name, giving a false call-back number." Tr. at 42–43.

William Pearson is an inspector with the Amtrak Police Department in charge of the Drug Interdiction Unit in Washington, D.C. He came to Amtrak in 1986 after 26 years of service in the Dade County (Florida) Police Department, 18 of those years in various drug enforcement investigative assignments. Tr. at 21. Beginning in 1980, he worked in a transportation unit with the mission of interdicting the movement of drugs by plane, train, and bus from South Florida. He had learned from that experience that train "compartments were the means of choice" for drug couriers on that route. Tr. at 22. On February 23, 1987, Pearson examined the manifest, or passenger list, of Amtrak Train 98, then en route from Miami to New York, focusing on the information about passengers travelling in compartments. The name of B. Johnson occupying roomette 3 on Train 98 caught Pearson's eye. Train 98 was due to arrive at Union Station in Washington, D.C. at 6:45 A.M. on February 24. The manifest indicated a telephone number for Johnson (401–232–8040) and also indicated that he had paid cash for a one-way ticket from Miami to Providence, Rhode Island. Pearson called that number to learn whether it was a "working number." Tr. at 23. The Providence police, on inquiry, reported that the number had been out of service for some time. Tr. at 24. This information led Pearson to attempt to interview B. Johnson when Train 98 arrived at Union Station and to notify members of the Drug Enforcement Agency. Pearson requested and received the assistance of Detective Michael C. Bernier and his narcotics detector dog.

In 1982, the dog handler, Detective Bernier, had received four months of training in the management of a particular dog, Max 25. The dog was trained to react to the presence of certain narcotics. The handler was trained to control the dog and to recognize reactions of the dog to the presence of those narcotics. By February 24, 1987, the two had worked together on numerous occasions. They had been credited with accurately detecting 52 deposits of narcotics. On only two occasions, Bernier had noted a reaction suggesting that the dog had detected narcotics which did not lead to a measurable deposit. Bernier had frequently testified about searches conducted with the aid of the dog in this and other area courts. Tr. at 6–7.

At 6:30 A.M., February 24, 1987, Pearson, Bernier and two other investigators met at Union Station. Train 98 arrived on schedule and the several officers with Max 25 boarded it. Train 98 was scheduled to remain in Union Station for 25 minutes while its engine was changed from diesel to electric. At stations between Washington

and New York no stop was scheduled for longer than three minutes.

Pearson, Bernier leading Max 25, and another Metropolitan Police Officer entered the car in which B. Johnson was reported to occupy roomette 3. Max 25 walked down the corridor of the car sniffing at the vents situated just above floor level of each roomette. According to Bernier, when Max 25 reached roomette 3, he "started scratching on the door and then he backed off and starting [sic] whining as if wanting to get in the room...." Tr. at 9. Bernier notified Pearson of a "narcotics alert". Pearson then took over. The door of roomette 3 was closed. Pearson approached the door and knocked on it, while Bernier, who had left Max 25 under the control of another officer, stood in the corridor. Tr. at 15. A voice from inside asked something like, "Who is it?" Pearson responded, "Amtrak." A male opened the door, at which time Pearson identified himself by his badge and credentials, saying further, "Police Officer, can I talk to you for a minute?" The male responded, "No." Tr. at 27. However, when Pearson asked for the passenger's ticket, he produced a one-way ticket to Providence issued to "B. Johnson." On further inquiry defendant identified himself as B. Johnson. He was not able to produce any identification. When asked if he would consent to a search, he replied, "Well, I'm not sure." Tr. at 28. In response to still further inquiry, he said that he had flown to Florida. Pearson indicated that during this colloquy he stood outside the roomette while the man who claimed to be B. Johnson sat, partially dressed, on the roomette bed and "appeared over-nervous," his "eyes darting in a nervous manner, around the compartment." Tr. at 28. Eventually, Pearson told the suspect about the positive alert by the trained drug detection dog that indicated the presence of a controlled substance in his compartment. Pearson said that based on that alert he was going to search the compartment. He asked the, by then, suspect to get dressed and step out of the compartment while the search was being conducted. The suspect complied without saying anything that Pearson could recall. Pearson then searched the compartment and found under the roomette bed a knapsack which had no locks on it, but was tightly closed with little straps. Tr. at 31. He opened the knapsack. Inside the knapsack he found a towel. Inside the towel he found a wrapped package with a bandaid over one portion of it. Pulling the bandaid away, Pearson saw a white crystalized powder which he believed to be cocaine. Later, chemical analysis established that the substance was indeed cocaine—500 grams. Pearson advised Bernier that he had found a deposit of narcotics and that Bernier should place defendant under arrest. This he did. There followed the instant indictment and defendant's motion to suppress the use of the seized cocaine as evidence.

### II.

When examining a claim of exigent circumstances, we review the District Court's legal conclusions under a *de novo* standard, but review its factual findings under a clearly erroneous standard. *United States v. Socey*, 846 F.2d 1439, 1445 (D.C.Cir. 1988). Because the facts in this case are not in dispute, we focus on the district court's legal conclusions.

■ The presence of exigent circumstances necessitating an immediate search is one of the "few specially established and well-delineated exceptions" to the rule that warrantless searches are *per se* unreasonable. *United States v. McClinnhan*, 660 F.2d 500, 503 (D.C.Cir.1981) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). The Supreme Court has recognized that the likelihood of destruction of evidence creates exigent circumstances that can excuse the need for a search warrant. *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966). When probable cause has been established and there is danger that evidence will be removed or destroyed before a warrant can be obtained, a warrantless search and seizure can be justified. *See United States v. Johnson*, 802 F.2d 1459, 1462 (D.C.Cir. 1986); *United States v. McEachin*, 670

F.2d 1139, 1144 (D.C.Cir.1981); *United States v. Allison,* 639 F.2d 792, 794 (D.C. Cir.1980).

The Supreme Court has also long recognized that, given probable cause, the ready mobility of a vehicle can justify an exigency exception to the warrant requirement of the Fourth Amendment. The circumstances created by the possibility of quick flight, in an automobile, for example, and the resultant removal of evidence from police access before a warrant can be brought to bear have been found sufficiently exigent to support the exception. *California v. Carney,* 471 U.S. 386, 390, 105 S.Ct. 2066, 2068–69, 85 L.Ed.2d 406 (1985) (citing *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *United States v. Caroline,* 791 F.2d 197 (D.C.Cir. 1986). This "automobile exception" takes into account that

> the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Carroll, supra,* 267 U.S. at 153, 45 S.Ct. at 285; *accord Carney, supra,* 471 U.S. at 390, 105 S.Ct. at 2068–69.

Appellant would distinguish these automobile precedents on the theory that the suspect here aboard a train, unlike the driver of a motor vehicle, was not in control of it. Brief for Appellant at 8. However, we agree with the observation of the Court of Appeals for the Fourth Circuit in a related context that where "[a roomette passenger on a moving train] had no ability to direct the train's movement, its continuing journey imposed practical constraints on the officers' ability to mount a full-fledged investigation within jurisdictional boundaries." *United States v. Whitehead,* 849 F.2d 849, 854 (4th Cir.1988). The same dynamics apply to a suspect in a roomette on a train stopping for a few minutes to change engines before proceeding out of the jurisdiction.

Appellant further argues that he had a heightened expectation of privacy in his train roomette. This issue was addressed in *United States v. Liberto,* 660 F.Supp. 889 (D.D.C.1987), *aff'd,* 838 F.2d 571 (D.C. Cir.1988), where this court affirmed a District Court decision that, because of pervasive government regulation of passenger railroad travel, a passenger travelling in a train roomette has a lesser expectation of privacy than a person in his home. The *Liberto* court upheld a warrantless search of a train roomette where the police had probable cause to believe that the roomette contained illicit drugs and where the train had stopped at Union Station for a short period of time, making it unlikely that the police could have obtained a warrant before the train departed. This precedent is dispositive of the privacy issue raised here.

■ Viewing this case with reference to the "totality of the factual circumstances," the District Court correctly found that the circumstances here created probable cause for Pearson to believe that defendant's roomette contained illicit drugs. *See United States v. Socey,* 846 F.2d 1439, 1446 (D.C.Cir.1988) (relying on *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). This finding is amply supported by the record of the unfolding events that culminated in the search. Inspector Pearson examined the train manifest and noticed that "B. Johnson" had reserved a compartment on Train 98, then en route from Miami, Florida to New York, and had paid cash for a one-way ticket from Miami to Providence, Rhode Island. Pearson called the "call-back number" listed for B. Johnson and learned that it had been out of service for some time. Upon entering the train while it stopped in Union Station the next day, Detective Bernier led Max 25 down the corridor outside roomette 3, the compartment assigned to B. Johnson, and Max 25 indicated a "narcotics alert" at the vent of the door to that roomette. B. Johnson, later identified as Mr. Tartaglia,

appeared "over-nervous" as he was being subsequently questioned by Pearson, and he was unable to produce any identification. Moreover, appellant does not claim that there was not probable cause sufficient to support a warrant. Brief of Appellant at 12. In any event, there is ample evidence in the record to support the conclusion that there was probable cause. The totality of these circumstances gave Pearson probable cause to believe that the roomette contained illicit drugs, *see United States v. Liberto, supra,* and entitled him to a search warrant, if there had been sufficient time to secure one. *See United States v. Fulero,* 498 F.2d 748 (D.C.Cir. 1974).

■ There being probable cause to conduct a search, the critical question becomes whether, "guided by the 'realities of the situation presented by the record,'" *McEachin, supra,* 670 F.2d at 1144 (quoting *United States v. Robinson,* 533 F.2d 578, 581 (D.C.Cir.1975) (*en banc*), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976)), there was a "reasonable likelihood that the item *would be moved* before a warrant could be obtained." *United States v. Martin,* 562 F.2d 673, 678 (D.C.Cir.1977). The District Court found that "exigent circumstances made it practically impossible to get a warrant for a person on board a train which was only going to stop for 25 minutes." Tr. at 55a. Noting that "[t]he amount of time necessary to obtain a warrant by traditional means has always been considered in determining whether circumstances are exigent," this court has recognized that the exigencies of a situation might preclude even the shortest possible delay involved in obtaining a telephonic warrant. *McEachin, supra,* 670 F.2d at 1146. In this case, Pearson entered the roomette and discovered the drugs within five minutes after he and his team boarded Train 98. He could have walked to a telephone in five minutes to seek a telephonic search warrant. It was not unreasonable, however, for the police or the District Court to conclude that no warrant could have been at hand and a search completed in the fraction of 25 minutes remaining before the train's scheduled departure. Moreover, the D.C. warrant would have been of no force and effect after the train had travelled the short distance from Union Station to the Maryland line. The train and the suspect would have been beyond the reach of any D.C. warrant almost as soon as the train pulled out of Union Station.

The rationale of the Court of Appeals for the Ninth Circuit in *United States v. Johnston,* 497 F.2d 397 (9th Cir.1974) is helpful here. That case involved a search of a suspect's suitcase located on an Amtrak train due to leave the San Diego station within moments. Having found that there was probable cause to believe the suspect was carrying marijuana, the *Johnston* court concluded that the circumstances were sufficiently exigent to justify an exception to the warrant requirement. That court stated that

> the agent was not required to assume that Defendant would stay on the train with the marijuana in the suitcases all the way to New York City. The agent could properly have believed that Defendant would depart with the suitcases at some stop along the way. Indeed, the agent could properly have believed that Defendant might well discharge one or both suitcases at some intermediate point to an accomplice in the criminal enterprise.

*Id.* at 398–99. Here, after its stop in Union Station, Amtrak Train 98 was scheduled to stop several times before it reached New York City, for no longer than a three minute delay at each station. Tr. at 25–26. It would not have been unreasonable for Pearson to believe that defendant would leave the train at any of the next several stops and that he would take the suspected narcotics with him. Theoretically, Pearson could have asked a train official to hold the train in Union station. But the train had a capacity for 600–800 passengers who would have been inconvenienced by the delay. Tr. at 34. Delaying the train could also have disrupted the movement of passenger and freight traffic moving and scheduled to move north and south in the heavily travelled eastern corridor, with attendant commercial and safety risks. Tr. at 32–34.

These factors weigh heavily in favor of a procedure that might be impermissible in their absence.

Because the police did not have sufficient time to procure a warrant before train 98 left Union Station and because there was more than a reasonable likelihood that the train, and therefore the roomette and its contents, would be moved before a warrant could be obtained, the warrantless search of defendant's roomette was justified under the exigent circumstances exception to the warrant requirement of the Fourth Amendment. In reaching this conclusion, we have not overlooked defendant's contention that the police could have seized the luggage in roomette 3 and then sought to obtain a warrant to search the knapsack. However, the detector dog indicated the narcotics alert at the vent of the door to roomette 3 and was then withdrawn. Tr. at 9–10. Because the police here had probable cause to believe that the suspected narcotics were located inside roomette 3, without any indication as to where in the roomette, (Tr. at 44), it was not unreasonable for them to search the roomette and its contents, including luggage, to discover the narcotics or to discover that narcotics were not there before the train was due to leave. It is established that a legitimate search of an automobile may extend to any container that could hold the object of the search. *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); *United States v. Caroline, supra*, 791 F.2d at 202. This principle easily extends to the search of a knapsack in a train roomette that was entered without a warrant but with probable cause in the exigent circumstances here.

Since we affirm the District Court's ruling on the basis of exigent circumstances, it is unnecessary to reach its alternate grounds for its decision.

### III.

In view of the foregoing, the decision of the District Court is

AFFIRMED.