**Michelle SYMES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 91–CM–812.**

District of Columbia Court of Appeals.

Argued April 13, 1993.

Decided Nov. 10, 1993.

G. Godwin Oyewole, Alexandria, VA, for appellant.

Douglas F. Gansler, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., at time brief was filed and Roy W. McLeese, III, Kathleen M. O'Connor, and Anthony Asuncion, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and KING, Associate Judges.

KING, Associate Judge:

Appellant was convicted of possession with intent to distribute marijuana, in violation of D.C.Code § 33–541(a)(1) (1988). On appeal, she argues that the trial court committed reversible error when it denied her motion to suppress evidence obtained in the course of a claimed illegal search and seizure. We affirm.

## I.

On February 20, 1991, Thomas Martin Cook, an investigator in Amtrak's Drug Enforcement Unit, reviewed the reservations list for persons departing from Fort Lauderdale, Florida. Cook was searching for passengers who fit the drug courier profile. He noted that a single one-way ticket had been purchased, with cash, for a double slumber coach for a passenger named Michelle Simms (not Symes, the correct spelling of appellant's last name). The reservation had been made the day before departure, the ticket was picked up only minutes before departure, and travel was from Fort Lauderdale, a known narcotics source city, to New York City. Cook called the telephone number listed on the reservation registration and asked for Michelle Symes. He was told by the person answering the phone that Michelle Symes would be home that evening. Cook knew that the train carrying Symes was not scheduled to arrive in New York until the following day.

Based on this investigation Cook contacted the Metropolitan Police Department and requested assistance for an interview with appellant while the train made a stop-over at Union Station in the District of Columbia. Cook, accompanied by Sergeant Lawson of Amtrak's Drug Enforcement Unit, and Detectives Bernier and Zattau of the Metropolitan Police Department, boarded the train on February 21, at 7:40 a.m. The officers, all in plain clothes, were accompanied by Bernier's police canine, Max 25. When they reached appellant's room, Max 25 was directed to sniff the air coming from the room through an exhaust vent. The dog complied with the order but gave no indication of the presence of narcotics. Cook then knocked on the door, and after appellant responded, he iden-

tified himself and asked if the two could talk. The other officers stood behind Cook and were not seen by appellant, although appellant testified that she thought she heard a voice behind Cook. Appellant agreed to speak with Cook and, when he so requested, she showed her ticket to him. Appellant had no personal identification and she denied possession of any narcotics, weapons, or explosives.

Cook noticed that appellant had two pieces of luggage in the room—a tote bag and a suitcase. Cook then asked appellant for permission to search the two items. Appellant consented to a search of her tote bag but would not agree to a search of the suitcase because it belonged to her sister, was locked, and she had no key for it. Cook then asked appellant if Max 25 could sniff the sister's suitcase. Appellant agreed and Cook then removed the suitcase from the room and handed it to Bernier, who was standing in the corridor with Max 25 and the other officers. Max 25 sniffed the suitcase and gave an alert which indicated that the bag contained drugs. At that point, the officers discussed whether it was necessary to obtain a search warrant in order to search inside the suitcase. They concluded that a warrant was not required. The officers then forced a small hole in the zipper which allowed them to see green bags. They then poked a hole in one of the green bags and saw a greenish-brown substance inside. Appellant was placed under arrest. The Drug Enforcement Agency ("DEA") laboratory tests determined the amount of marijuana to be 6,125 grams (roughly fourteen pounds).

The trial court denied the motion to suppress, finding that "the detective [had] articulable suspicion to have this bag sniffed or alternatively there was consent to the sniff of the bag." Thereafter, the court held that "once the reliable dog smelled the narcotics ... there was no reason, no need to obtain a search warrant under the exigent circumstances and/or car exception."

Appellant argues the trial court's denial of the motion to suppress was error. She challenges the interrogation by the police, claiming that prior to the discovery of the drugs,

she had been unlawfully seized. Appellant also contends that the trial court erred in relying on either the exigent circumstances exception or the automobile exception to excuse the warrant requirement of the Fourth Amendment. We reject each claim made by appellant and conclude that the seizure of the marijuana in the suitcase was valid.

## II.

The scope of our review of an appeal from the trial court's denial of a motion to suppress evidence is defined by our cases. *See Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989). "Essentially, our role is to ensure that the trial court had a substantial basis for concluding that no [Fourth Amendment] violation occurred." *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991) (citing *Goldston v. United States,* 562 A.2d 96, 98 (D.C.1989)). "In reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citations omitted).

■ Appellant first challenges the validity of her initial encounter with the police. The Supreme Court, however, has made clear that when police officers approach individuals to ask questions, such encounters do not necessarily constitute a seizure. "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required." *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991); *see also California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) ("show of authority" is an objective test that focuses on an officer's words and actions); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (police may request a particular individual's consent to a search of his or her luggage); *United States v. Mendenhall,* 446 U.S. 544, 557–58, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980) (police may ask to exam-

ine individual's identification); *In re J.M.,* 619 A.2d 497, 501 (D.C.1992) (en banc) (finding no seizure when plain clothes officers boarded bus, announced their identities, approached J.M. and asked permission to search his bag); *Kelly v. United States,* 580 A.2d 1282, 1286 (D.C.1990) (when police officer approaches, shows official identification and questions individual, that does not, without more, amount to seizure). Moreover in this case, based on the facts revealed about appellant in the course of the Amtrak official's investigation, appellant fit the profile of a passenger who could be engaged in drug trafficking—facts which the Supreme Court has held provide adequate grounds for temporary detention to permit police to verify or dispel their suspicions. *See Royer, supra,* 460 U.S. at 502, 103 S.Ct. at 1326; *Mendenhall, supra,* 446 U.S. at 547 n. 1, 100 S.Ct. at 1873 n. 1. We are satisfied that since the actions taken by Cook—taking into account the conversational tone of his questions, the noncoercive request for a search, and appellant's consent to a search of her own bag and to a sniff by Max 25 of her sister's luggage—did not constitute an unlawful seizure, the trial court did not err in finding that, under these circumstances, the police conduct was proper.

■ Appellant further maintains that even if the seizure was not illegal, her consent to the search, i.e., the sniffing of the suitcase by Max 25, was the result of an "intrinsically coercive situation created by the initiation of the interrogation by the police inside the cramped quarters of a train compartment ... [so that] any freedom that she might have theoretically had to withhold her consent was illusory." Appellant additionally argues that she was not advised of her right to withhold her consent and, relying on *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), claims that her consent was not voluntary because she did not "knowingly and intentionally waive[ ] her Fourth Amendment rights." The latter contention fails since the Supreme Court rejected the imposition of a requirement that police give consent warnings, finding any such request to be "impractical." *Schneckloth v. Bustamonte,* 412 U.S. 218, 231–33, 93 S.Ct.

2041, 2049–50, 36 L.Ed.2d 854 (1973) (rejecting "proof of knowledge of the right to refuse consent [as] a necessary prerequisite to demonstrating a 'voluntary' consent"). In *Schneckloth*, the Court found that "[a]lmost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Id.* at 237, 93 S.Ct. at 2052–53. In this case, appellant admitted in her testimony during the suppression hearing that she had consented to a sniff of the bag by the dog. That is consistent with Cook's testimony that appellant voluntarily gave her consent for that purpose.[1] The trial court concluded that "it was proper to seize the bag because there was . . . consent by the defendant," and that conclusion is amply supported by the record. *See In re J.M., supra,* 619 A.2d at 500 (noting that we are "bound to uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous") (citations omitted).

█ Finally, appellant contends the police violated her Fourth Amendment right to be free from illegal searches and seizures when they opened the suitcase without first obtaining a search warrant. We also reject that claim. We note first that, as the trial court found, and as discussed later, once Max 25 alerted after sniffing the suitcase, there was probable cause to believe it contained drugs. The issue thus presented is whether the police were required to obtain a search warrant before entering the suitcase. It is well-settled that "subject to only a few specifically established and well-delineated exceptions," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), all searches must have prior approval by a judge or magistrate. The trial court, however, relying on *United States v. Colyer,* 278 U.S.App.D.C. 367, 878 F.2d 469 (1989) and *United States v. Tartaglia,* 275 U.S.App.D.C. 15, 864 F.2d 837 (1989), found that exigent

circumstances excused the warrant requirement.

The facts in *Tartaglia* are, with an exception to be discussed, strikingly similar to the facts in this case. There, an inspector with Amtrak examined the passenger list of a train traveling from Miami to New York. After determining that a passenger (Tartaglia) fit the drug courier profile,[2] the inspector contacted members of DEA and received the assistance of Detective Bernier and the same Max 25 who was used in this case. The officers and the dog boarded the train and walked down the corridor leading to Tartaglia's roomette. Max 25 sniffed at the floor vents of each roomette, alerting at the door of Tartaglia's roomette. The Amtrak inspector knocked at the door and when Tartaglia opened it he was asked if they could talk. When Tartaglia replied that he "wasn't sure" if he would consent to a search, the Amtrak inspector informed him that the dog had indicated the presence of a controlled substance in the roomette. Tartaglia was then asked to step out of the roomette so it could be searched. During the search a knapsack was found under the bed. The Amtrak official opened the knapsack and found a wrapped package containing 500 grams of cocaine.

In reviewing the trial court's denial of the motion to suppress the cocaine found in the knapsack, the *Tartaglia* court found that the "unfolding events that culminated in the search" supported a finding of probable cause. *Tartaglia, supra,* 275 U.S.App.D.C. at 19, 864 F.2d at 841. These events included the profile, the "call-back" telephone number that was a non-working number, nervousness of the suspect, the lack of personal identification, and the alert by Max 25. In this case, we have a nearly identical profile, the "call-back" with information that did not jibe with appellant's travel plans, the lack of personal identification, and the alert by Max 25. Moreover, appellant does not claim, nor did Tartaglia, that once Max 25 alerted to the

---

1. The court noted, however, that while appellant had consented to the sniff of the bag, "consent to search [inside] the bag . . . was never given."

2. Tartaglia had paid cash for a one-way ticket for a roomette on an Amtrak traveling from Miami to Providence, Rhode Island. The call-back number was out-of-service and had been so for some time.

presence of drugs, probable cause was lacking.[3]

We note that, on its face, the instant case is distinguishable from *Tartaglia* because here the police knew the suitcase was the container of the contraband; whereas, the police in *Tartaglia* only knew that drugs were somewhere in the roomette. This distinction may have been legally significant at the time *Tartaglia* was decided in 1989 under *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).[4] Since then, however, the Supreme Court, in *California v. Acevedo*, 500 U.S. 565, ——, 111 S.Ct. 1982, 1989, 114 L.Ed.2d 619 (1991), clarified the law regarding the search of containers within movable vehicles. In *Acevedo*, the Supreme Court recognized that the holdings in *Sanders* and *Chadwick* create a "dichotomy [that] dictates that if there is probable cause to search a car, then the entire car—including any closed container found therein—may be searched without a warrant, but if there is probable cause only as to a container in the car, the container may be held but not searched until a warrant is obtained." *Id.* 500 U.S. at ——, 111 S.Ct. at 1985. In rejecting that distinction, the *Acevedo* Court held that "[t]he police may search an automobile and the containers within it where they have probable cause to believe that contraband or evidence is contained." *Id.* at ——, 111 S.Ct. at 1991.

Therefore, in the present case, once the police had probable cause to believe the suitcase contained contraband, they could immediately search it without a warrant if one of the warrantless search exceptions applied.

Applying *Acevedo*, therefore, permits us to proceed to the next step of our analysis which was aptly expressed by the *Tartaglia* court: "[t]here being probable cause to conduct a search, the critical question becomes whether, guided by the realities of the situation presented by the record, there was a reasonable likelihood that the item *would be moved* before a warrant could be obtained." *Tartaglia, supra,* 275 U.S.App.D.C. at 20, 864 F.2d at 842 (citations and internal quotations omitted). In finding that exigency justified the warrantless search in *Tartaglia,* the court noted that "the police did not have sufficient time to procure a warrant . . . and . . . there was more than a reasonable likelihood that the train, and therefore the roomette and its contents, would be moved before a warrant could be obtained." *Tartaglia, supra,* 275 U.S.App.D.C. at 21, 864 F.2d at 843; *see also Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (noting that destruction of evidence creates exigent circumstances). The same considerations apply in this case and, for those reasons, we are satisfied that the trial court did not err when it found that the mobility of the train and its impending

---

**3.** The accuracy of Max 25 in locating contraband or narcotics has been acknowledged in a number of cases. *See United States v. Colyer, supra,* 278 U.S.App.D.C. at 369–70 n. 2, 878 F.2d at 471–72 n. 2 (citing cases detailing the successes of Max 25).

**4.** In *Chadwick,* Amtrak officials noticed a footlocker leaking talcum powder, a substance commonly used to mask the odor of marijuana. In addition, one of the two people transporting the footlocker matched the drug courier profile. At the Amtrak station in Boston, a police canine alerted positively to the presence of narcotics without the respondents being aware that the dog had done so. Federal agents then observed respondents move the footlocker to the trunk of an automobile. The respondents were then arrested and taken into custody. The footlocker was seized by the agents and it remained in "the exclusive control of law enforcement officers at all times . . . [and] there was no risk that whatever was contained in the footlocker trunk would

be removed by the defendants or their associates." *Id.* 433 U.S. at 4, 97 S.Ct. at 2480. Approximately ninety minutes after the arrests, the footlocker was opened and the agents found a large amount of marijuana. The Supreme Court held that since there was "no exigency it was unreasonable for the Government to conduct th[e] search without the safeguards a judicial warrant provides." *Id.* at 11, 97 S.Ct. at 2483.

In *Sanders,* the Court extended *Chadwick's* rule to apply to a suitcase actually being transported in the trunk of an automobile. In *Sanders,* the police had probable cause to believe that a suitcase which they saw being placed in the trunk of a taxi had contraband inside of it. The police stopped the taxi, searched the suitcase, and recovered narcotics. The Court rejected the automobile exigency argument and held that police could not conduct a warrantless search of a trunk, under these circumstances, "merely because it was located in an automobile lawfully stopped by the police." *Sanders, supra,* 442 U.S. at 765, 99 S.Ct. at 2594.

departure provided the requisite exigent circumstances to justify the officers' deviation from the warrant requirement of the Fourth Amendment.[5] Once the dog alerted to the presence of contraband, probable cause and exigent circumstances made the immediate search proper. *See Acevedo, supra*, 500 U.S. at ——, 111 S.Ct. at 1986.

For these reasons, we hold that the trial court did not err in denying appellant's motion to suppress.

*Affirmed.*

---

**5.** While it is well established that there is a reduced expectation of privacy in automobiles, *see, e.g., Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the same consideration, i.e., the exigency created of ready mobility, also applies to train roomettes in interstate transit. *See, e.g., United States v. Whitehead*, 849 F.2d 849, 854 (4th Cir.1988).