

IN THE

# Court of Appeals of Indiana

Norvell Dunem,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Mar 14 2025, 9:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

March 14, 2025

Court of Appeals Case No.
24A-CR-1423

Interlocutory Appeal from the LaPorte Superior Court

The Honorable Jaime M. Oss, Judge

Trial Court Cause No.
46D01-2205-F2-615

---

**Opinion by Judge Kenworthy**
Chief Judge Altice and Judge Bradford concur.

**Kenworthy, Judge.**

## Case Summary

[1] During a one-thing-led-to-another traffic stop of a Greyhound bus, police recovered 127 grams of cocaine from a black duffle bag situated on an overhead rack in the bus's passenger compartment. Alongside the cocaine was a bus ticket bearing Norvell Dunem's name. In time, the State charged Dunem with Level 2 felony dealing in cocaine or a narcotic drug. Dunem moved to suppress all evidence, arguing the search of the bus and the duffle bag violated his rights under both the United States and Indiana Constitutions. After the trial court denied his motion, Dunem initiated this interlocutory appeal, raising the following issue: Did the trial court err in denying his motion to suppress? We affirm.

## Facts and Procedural History[1]

[2] On May 11, 2022, Deputy Wade Wallace of the LaPorte County Sheriff's Office was patrolling on Interstate 80 when he observed an eastbound Greyhound bus "cross left of center" and "veer over the fog line." *Tr. Vol. 2* at 7. Because this was a traffic infraction, Deputy Wallace began a traffic stop. It was around 8:22 a.m.

---

[1] We heard oral argument at Frankfort High School on February 27, 2025, as part of this Court's Appeals on Wheels program. We thank the school's faculty and staff for the warm welcome, the students of Clinton Central High School, Clinton Prairie High School, Frankfort High School, and Rossville High School for their attention and thoughtful questions, and the attorneys for the quality of their arguments.

[3] The bus pulled over and stopped on the shoulder of the highway. Deputy Wallace approached the bus and was greeted by the driver and bus supervisor.[2] Deputy Wallace explained the reason for the stop, learned the bus had seventeen passengers, and collected the driver's license and proof of insurance. He also asked for consent to search the bus. The supervisor said Deputy Wallace would need permission from Greyhound to do so. After receiving the requested documentation, Deputy Wallace informed the driver he planned to issue a written warning and returned to his police vehicle "to start [his] traffic enforcement," which included entering the driver's license and registration information into his computer, checking the proof of insurance, running a warrant check, and gathering his warning book. *Id.* While doing so, Deputy Wallace noticed a few passengers had exited the bus and were watching him and smoking cigarettes.

[4] "Maybe 10 or 12 minutes" after the initial traffic stop, Deputy Jon Samuelson arrived on scene with Bosco, a Belgian Malinois trained to detect certain narcotics (cocaine, marijuana, methamphetamine, heroin, and ecstasy). *Id.* at 11. Deputy Wallace had called for Deputy Samuelson due to "officer safety reasons" tied to the number of bus passengers compared to law enforcement officers. *Id.* at 42. Deputy Samuelson immediately noticed a few passengers standing outside the bus smoking cigarettes, which he thought could be a sign

---

[2] The driver of the bus was "in training." *Id.* at 9. Another Greyhound employee was on the bus to supervise the trainee driver.

of nervousness or an effort to mask odor. Deputy Samuelson considered the passengers' behavior a "red flag" and "odd given that [they] were on the side of an interstate." *Id.* at 43.

[5] Within minutes of his arrival, Deputy Samuelson conducted an open-air dog sniff by walking Bosco around the exterior of the bus.[3] Bosco soon "alerted" toward the front of the luggage compartment, signaling, through a distinctive set of behaviors, he smelled drugs there. Bosco was right: while searching a pink suitcase, police found "approximately 15 pounds of vacuum-sealed marijuana." *Id.* at 46. But the suitcase lacked any identifying information. So after waiting for additional law enforcement officers, Deputies Samuelson and Wallace boarded the bus to locate the suitcase's owner.

[6] Deputy Wallace approached some passengers at the back of the bus while Deputy Samuelson started up front. Within minutes, Deputy Samuelson received consent to search a passenger's backpack. Inside the backpack was an "AR-15 pistol." *Id.* at 48. Meanwhile, Deputy Wallace recovered a pair of handguns from another passenger. By now, the deputies' "stress level was a little high" and everything was "flowing, one thing after another." *Id.* at 52, 37.

[7] Around this time, Deputy Samuelson noticed a passenger—later identified as Jarvis Alexander—reboard the bus and take a seat below a black duffle bag in

---

[3] Bosco never went inside the bus's passenger compartment because he is "dual-purpose," meaning he does "narcotics detection as well as apprehension or bite work." *Id.* at 55. Deputy Samuelson was concerned Bosco could have injured a passenger if he was brought aboard the bus.

the overhead storage area. Because Alexander avoided eye contact with law enforcement and "the fact that [police] had located other firearms," Deputy Samuelson "conducted a pat-down" of Alexander to "make[] sure he didn't have a weapon." *Id.* at 49. Deputy Samuelson did not locate a weapon.

[8] Deputy Samuelson then turned his attention to the duffle bag. Neither Alexander nor any other passengers "claimed the bag." *Id.* Deputy Samuelson then removed the bag from the overhead storage area and found a "large amount of suspected narcotics" hidden within. *Id.* at 50. After taking Alexander into custody, Deputy Samuelson once again patted him down. This time, Deputy Samuelson recovered a handgun tucked under Alexander's upper arm. Police took the duffle bag off the bus and, during a more thorough search, found Dunem's bus ticket alongside the suspected narcotics. Dunem—who was outside the bus—was taken into custody.[4] After being advised of his *Miranda* rights, Dunem asserted the duffle bag was not his and claimed he had $5,000 cash in his pocket. After first sharing he did not work, Dunem later told police the money was from selling a used car.

---

[4] Earlier in the events, police asked Dunem to unlock his suitcase stored in the luggage compartment. Dunem did so and the police found nothing illegal.

[9]     In total, the traffic stop lasted around one hour and led to the recovery of over one hundred grams of narcotics, about fifteen pounds of marijuana,[5] four handguns, and some "wanted individuals." *Id.* at 36.

[10]    After the State charged Dunem with Level 2 felony dealing in cocaine or a narcotic drug, he moved to suppress evidence recovered from the duffle bag, claiming police had violated his rights under both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. The trial court denied Dunem's motion. Dunem then sought an interlocutory appeal. The trial court certified its order, and this Court accepted jurisdiction. *See* Ind. Appellate Rule 14(B).

## Standard of Review

[11]    We review a trial court's decision denying a motion to suppress "deferentially, construing conflicting evidence in the light most favorable to the ruling." *Marshall v. State*, 117 N.E.3d 1254, 1258 (Ind. 2019) (quoting *Robinson v. State*, 5 N.E.3d 362, 365 (Ind. 2014)), *cert. denied*. Although we review the trial court's factual findings for clear error and do not reweigh evidence or judge witness credibility, we "consider any substantial and uncontested evidence favorable to the defendant." *Id.* (quoting *Robinson*, 5 N.E.3d at 365). But if the defendant's suppression motion presents a question of law, like the constitutionality of a search or seizure, we review the trial court's determination *de novo*. *Id.*; *see also*

---

[5] Police never identified the owner of the suitcase containing the marijuana.

*Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) ("[T]he ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo.").

## Police did not violate Dunem's Fourth Amendment rights.

[12] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV.  The "basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (citation omitted).  As its text makes clear, the Fourth Amendment's "ultimate touchstone" is reasonableness.  *Lange v. California*, 594 U.S. 295, 301 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  Assessing a search or seizure's reasonableness under the Fourth Amendment commonly involves weighing the degree to which it intrudes upon an individual's privacy and the degree to which it is needed for the promotion of legitimate governmental interests.  *Wyoming v. Haughton*, 526 U.S. 295, 300 (1999).

[13] Here, Dunem's Fourth Amendment claim is two-fold.  First, he claims police impermissibly prolonged the otherwise-lawful traffic stop of the Greyhound bus to conduct a dog sniff.  And second, Dunem contends the warrantless search of his duffle bag was unreasonable.[6]  "The twists and turns of Fourth Amendment

---

[6] In its brief, the State contended Dunem "lacks standing to specifically challenge the search of the black duffle bag" because he denied it was his in response to police questioning.  *Appellee's Br.* at 16.  During oral

law are often difficult to negotiate, with variations in fact patterns often determinative of the outcome of cases involving warrantless searches." *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001). This case fits that bill.

### A. Police did not impermissibly prolong the traffic stop to conduct a dog sniff.

Dunem does not challenge the legitimacy of the initial traffic stop. *See Appellant's Br.* at 7 (describing the stop as "valid"). Rightfully so, because even a minor traffic violation gives police probable cause to stop the driver of the vehicle. *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013). Nor does Dunem contend the dog sniff by itself violated his Fourth Amendment rights. Again, rightfully so. A dog sniff conducted by a well-trained narcotics-detection dog during a lawful traffic stop is not a search for purposes of the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *State v. Hobbs*, 933 N.E.2d 1281, 1286 (Ind. 2010). "Accordingly, no degree of suspicion is required to summon the canine unit to the scene to conduct an exterior sniff of the car or to conduct the sniff itself." *Hobbs*, 933 N.E.2d at 1286. Rather, Dunem's argument is more subtle. He contends police impermissibly prolonged the traffic stop to conduct the dog sniff.

A seizure "justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to

argument, however, the State conceded Dunem has standing to bring his Fourth Amendment and Section 11 claims. *See Oral Argument* at 37:51–38:15, https://mycourts.in.gov/arguments/default.aspx?&id=2974&view=detail&yr=&when=&page=1&court=&search=&direction=%20ASC&future=False&sort=&judge=&county=&admin=False&pageSize=20.

complete that mission." *Caballes*, 543 U.S. at 407. In other words, the Fourth Amendment does not countenance an indefinite seizure. Instead, the "tolerable duration" of a seizure for a traffic violation is shaped by the stop's "mission"—addressing the traffic violation that warranted the stop and attending to related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop,'" like checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 355 (quoting *Caballes*, 543 U.S. at 408) (brackets omitted). Once the "tasks tied to the traffic infraction are—or reasonably should have been—completed[,]" however, police authority for the seizure ends. *Id.* at 354. That is, police "may conduct certain unrelated checks during an otherwise lawful traffic stop," but they "may not do so in a way that prolongs the stop[.]" *Id.* at 355.

[16] One unrelated check is summoning a police canine to conduct a dog sniff for contraband. *See id.* at 356 (noting a dog sniff is "not an ordinary incident of a traffic stop" and is "not fairly characterized as part of the officer's traffic mission"). When this occurs, the critical question is one of timing: Does conducting the dog sniff prolong the traffic stop beyond the time reasonably required to complete the "mission" of the stop? *Id.* at 357. If so, police must have reasonable suspicion ordinarily demanded to justify detaining an individual. *Id.* at 355; *Austin*, 997 N.E.2d at 1034 (expressing a dog sniff "is an unreasonable investigatory detention if the motorist is held for longer than

necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity"). When challenged, the State bears the burden of showing the time for a traffic stop was not impermissibly increased due to a dog sniff. *Tinker v. State*, 129 N.E.3d 251, 256 (Ind. Ct. App. 2019), *trans. denied*.

[17] Around ten to twelve minutes after Deputy Wallace stopped the bus, Deputy Samuelson arrived and began walking Bosco around the bus to sniff for drugs.[7] As Bosco sniffed, Deputy Wallace finished inspecting the driver's license and proof of insurance and rejoined the bus's driver to start filling out a written warning. Bosco "alerted" to the presence of contraband within a minute. Deputy Wallace was still writing the warning. The dog sniff did not impermissibly prolong the traffic stop. *See Hansbrough v. State*, 49 N.E.3d 1112, 1115 (Ind. Ct. App. 2016) (finding no impermissible prolonging where a canine officer arrived about fourteen minutes after the stop began and the dog alerted two minutes later while police were still checking for warrants), *trans. denied*.

---

[7] In arguing the delay was "in excess of an hour," Dunem focuses on the incorrect timeline for determining whether police unlawfully prolonged the traffic stop to conduct a dog sniff. *Appellant's Br.* at 9. In one sense, Dunem is correct: from start to finish, the traffic stop lasted around one hour. But the relevant timeframe for this particular inquiry is the ten to twelve minutes it took Deputy Samuelson and Bosco to arrive and conduct the dog sniff.

### B. The automobile exception justified the warrantless search of the bus and duffle bag.

[18] Notwithstanding the permissible dog sniff, Dunem maintains police violated his constitutional rights by searching and seizing his duffle bag without a warrant. The Fourth Amendment generally prohibits warrantless searches, but there are exceptions. *Myers v. State*, 839 N.E.2d 1146, 1150 (Ind. 2005); *see also Katz v. United States*, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically and well-delineated exceptions.") (footnotes omitted). Once it is shown police conducted a search without a warrant, the burden shifts to the State to show the search fits within one of the recognized exceptions to the warrant requirement. *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016).

[19] Here, the State claims the search was permissible under the so-called "automobile exception," which allows police to search a vehicle without obtaining a warrant if the vehicle is readily mobile and there is probable cause to believe the vehicle contains contraband or evidence of a crime. *Meister v. State*, 933 N.E.2d 875, 878–79 (Ind. 2010); *see also Carroll v. United States*, 267 U.S. 132, 158–59 (1925). The automobile exception is rooted in two justifications: "1) a vehicle is readily moved and therefore the evidence may disappear while a warrant is being obtained, and 2) citizens have lower expectations of privacy in their vehicles than in their homes." *Hobbs*, 933 N.E.2d at 1285. When these justifications "'come into play,' officers may

search an automobile without having obtained a warrant so long as they have probable cause to do so."[8] *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (quoting *California v. Carney*, 471 U.S. 386, 393 (1985)). Under these circumstances, "the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable." *Carney*, 471 U.S. at 393.

[20]     "The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). So, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825; *see also California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."). Said another way, "[w]hen there is probable cause to search for contraband in a car, it is reasonable for police officers . . . to examine packages and containers without a showing of individualized probable cause for each one." *Houghton*, 526 U.S. at 302 ("[N]either *Ross* itself nor the historical evidence it relied upon admits of a distinction among packages or containers based on ownership.").

---

[8] No separate exigent circumstances are required for the automobile exception to apply. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam); *Hobbs*, 933 N.E.2d at 1286.

[21]     Although Dunem accepts Bosco's alert gave police probable cause to search the bus's luggage compartment, he asserts probable cause did not extend to the passenger compartment of the bus, and particularly his duffle bag.[9]  His view is too narrow.  Absent a successful challenge to a drug-detection dog's reliability, a dog's "alert" provides police with probable cause to believe a *vehicle* contains illicit drugs.[10]  *Hobbs*, 933 N.E.2d at 1286; *Ramsey v. State*, 222 N.E.3d 1038, 1045 (Ind. Ct. App. 2023) ("A dog sniff of the exterior of the vehicle indicating the presence of illicit substances provides probable cause for a warrantless search of the interior of the vehicle under the automobile exception."), *trans. denied*.  So, a "dog alert creates general probable cause to search a vehicle; it does not implicate the precision of a surgeon working with scalpel in hand." *United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004) (holding a canine alert toward the passenger area of a vehicle provided probable cause to search the vehicle's trunk as well).  Armed with probable cause to believe the bus contained illegal drugs based on Bosco's alert, police could lawfully search

---

[9] To the extent Dunem argues police could have taken additional steps during their investigation, like taking Bosco aboard the bus to sniff for drugs, we are mindful that with the benefit of hindsight, courts "can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985).  But that does not necessarily mean police conduct was unreasonable.  We focus on what police did, not what they could have done.

[10] Dunem has not challenged Bosco's reliability. *See United States v. Johnson*, 93 F.4th 383, 388 (7th Cir. 2024) (upholding a trial court's finding that a drug sniffing dog's alerts gave police probable cause to search a car because the defendant did not challenge the dog's reliability).  Even if he had, however, "[t]he question— similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.  A sniff is up to snuff when it meets that test." *Florida v. Harris*, 568 U.S. 237, 248 (2013).

every part of the bus and its contents that may conceal the object of the search, including the duffle bag. *See Ross*, 456 U.S. at 825.

[22] Yet Dunem highlights he was a passenger on a commercial bus, not the driver or passenger of a personal automobile. In his eyes, this fact makes a critical difference to our constitutional analysis. But "[w]ith few exceptions, the courts have not hesitated to apply the vehicle exception to vehicles other than automobiles." *Carney*, 471 U.S. at 393 n.2.[11] To determine whether the automobile exception applies under these circumstances, we revisit its justifications, both of which "come into play" here. *Collins*, 584 U.S. at 592.

[23] To refresh, the automobile exception is based on a vehicle's ready mobility and its occupants' lesser expectations of privacy. *See Myers*, 839 N.E.2d at 1150. Here, the bus was readily mobile; Dunem does not contend otherwise. That leaves Dunem's privacy interests. As explained in *Haughton*, cars "trave[l] public thoroughfares, seldom serv[e] as . . . the repository of personal effects, are subjected to police stop and examination to enforce pervasive governmental controls . . . and, finally, are exposed to traffic accidents that may render all their contents open to public scrutiny," hence, the "reduced expectation of

---

[11] Several courts have applied the automobile exception to common carriers, like buses and trains, on the grounds that those modes of transportation are mobile and involve reduced privacy expectations. *See, e.g., United States v. Tartaglia*, 864 F.2d 837 (D.C. Cir. 1989) (train); *United States v. Whitehead*, 849 F.2d 849 (4th Cir. 1988) (train), *cert. denied*; *United States v. Pina*, 648 Fed. Appx. 899 (11th Cir. 2016) (bus); *Green v. State*, 978 S.W.2d 300 (Ark. 1998) (bus); *State v. Vaughn*, 989 N.W.2d 378 (Neb. 2023) (train), *cert. denied*; *Symes v. United States*, 633 A.2d 51 (D.C. 1993) (train); *State v. Lovely*, 365 P.3d 431 (Idaho Ct. App. 2016) (bus); *Alvarez v. Com.*, 485 S.E.2d 646 (Va. Ct. App. 1997) (bus).

privacy" tied to property transported in cars. 526 U.S. at 303 (internal quotations and citations omitted).

[24] So, too, regarding a bus. A commercial bus, like any other vehicle in transit on public roads and highways, is subject to a plethora of government regulation and control. *See Carney*, 471 U.S. at 392 (describing the regulation of vehicles capable of traveling on public highways as "pervasive"). Plus, a passenger on a commercial bus is subject to observation by bus personnel and fellow travelers—most, if not all, of whom are strangers. This is not to say a bus passenger surrenders all privacy interests once they step aboard. They do not. *See, e.g., Bond v. United States*, 529 U.S. 334, 338–39 (2000) (holding a bus passenger maintained a reasonable expectation of privacy in an opaque bag he placed in an overhead bin, even though he knew it could be handled or moved by employees or other passengers). But a passenger's privacy expectations are "ordinarily weak" and "considerably diminished." *Haughton*, 526 U.S. at 306, 304. And when balanced against the governmental interest in thwarting the risk that evidence or contraband will be permanently lost while a warrant is obtained, the competing interests often militate in favor of law enforcement needs.

[25] All this to say, the automobile exception's justifications also apply here. The search of the duffle bag was therefore reasonable and justified under the automobile exception to the warrant requirement.

# Police did not violate Dunem's Article 1, Section 11 rights.

[26] Dunem also argues police violated his rights under Article 1, Section 11 of the Indiana Constitution, which guarantees, in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated[.]" Ind. Const. art. 1, § 11. Although the language of Section 11 is nearly identical to its federal counterpart, our courts interpret the state provision "independently and ask whether the State has shown that a particular search or seizure was reasonable based on the totality of the circumstances." *Ramirez v. State*, 174 N.E.3d 181, 191 (Ind. 2021). In doing so, we use the framework set forth in *Litchfield v. State*, 824 N.E.2d 356 (Ind. 2005). We determine the reasonableness of a law-enforcement officer's search or seizure by balancing three factors: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Id.* at 361. "When weighing these factors as part of our totality-of-the-circumstances test, we consider the full context in which the search or seizure occurs." *Hardin v. State*, 148 N.E.3d 932, 943 (Ind. 2020), *cert. denied*.

## *A. Degree of concern, suspicion, or knowledge that a violation has occurred*

[27] We begin by evaluating the law-enforcement officer's "degree of concern, suspicion, or knowledge that a violation has occurred." *Litchfield*, 824 N.E.2d at 361. We consider all the information available to the officers at the time of the search or seizure. *Hardin*, 148 N.E.3d at 943. Once Bosco "alerted" to the

presence of narcotics, police had a high degree of concern or knowledge the bus contained evidence of a crime. *See Hobbs*, 933 N.E.2d at 1287 (noting law enforcement officers "had a high degree of confidence" a vehicle contained drugs following a drug dog's alert). This degree of concern only increased once police found fifteen pounds of marijuana in the luggage compartment and guns and "wanted individuals" on the bus. *See Young v. State*, 244 N.E.3d 950, 961 (Ind. Ct. App. 2024) (explaining police concern that a violation of the law occurred "only heightened" as police located drugs and paraphernalia inside a vehicle following a police dog alert), *trans. denied*. Police had a high degree of concern, suspicion, or knowledge a violation had occurred when they searched Dunem's duffle bag.

### B. Degree of intrusion

[28] Next, we consider "the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities." *Litchfield*, 824 N.E.2d at 361. We measure the degree of intrusion from the defendant's point of view, considering the "intrusion into both the citizen's physical movements and the citizen's privacy." *Hardin*, 148 N.E.3d at 944. Additionally, we focus on the degree of intrusion caused by the method of search or seizure. *Id.* at 945. That is, "how officers conduct a search or seizure matters." *Id.* (emphasis omitted).

[29] The dog sniff itself was not a search and, especially because it occurred shortly after the bus was stopped, the resulting intrusion was minimal. *See Austin*, 997 N.E2d at 1036 (determining a dog sniff conducted shortly after a legitimate traffic stop did not intrude into the defendant's ordinary activities). Likewise, a

traffic stop typically amounts to a small intrusion on a citizen's ordinary activities. *Marshall*, 117 N.E.3d at 1262. That said, the traffic stop in this case spanned around one hour as police pursued their investigation, thereby increasing the degree of intrusion. The degree of intrusion into Dunem's ordinary activities was therefore moderate.

### C. Extent of law enforcement's needs

[30] Under the final *Litchfield* factor, we review the extent of law enforcement's needs "to act in a general way" and "to act in the particular way and at the particular time they did." *Hardin*, 148 N.E.3d at 946–47. Our Supreme Court has recognized law enforcement needs related to drug interdiction are significant. *Austin*, 997 N.E.2d at 1036 ("Intra- and international drug trafficking are significant issues facing law enforcement and public safety officials at the federal, state, and local levels."); *see also State v. Timbs*, 169 N.E.3d 361, 373 (Ind. 2021) (pointing out "distributing or possessing even small amounts of drugs threatens society"). Law enforcement needs only grew following Bosco's "alert" and the subsequent recovery of around fifteen pounds of marijuana from the luggage compartment and several guns and "wanted individuals" from the passenger compartment. *See Crabtree v. State*, 199 N.E.3d 410, 417 (Ind. Ct. App. 2022) (classifying law enforcement needs as high based on suspicion criminal activity was afoot after completing initial reason for investigation). And police needed to act in the way they did to prevent evidence from disappearing while pursuing a warrant. *See Myers*, 839 N.E.2d at 1154 (upholding a search of a vehicle based in part on elevated law-enforcement

needs when the vehicle's owner was not under arrest and may have driven the vehicle away). The extent of law-enforcement needs was high.

On balance, the significant law-enforcement needs and concerns outweigh the notable intrusion. As a result, the search was reasonable and did not violate Dunem's Section 11 rights.

## Conclusion

Police did not violate Dunem's Fourth Amendment or Article 1, Section 11 rights. The trial court was therefore right to deny his motion to suppress.

Affirmed.

Altice, C.J., and Bradford, J., concur.

ATTORNEY FOR APPELLANT
Scott King
Gary, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Indiana Attorney General

Justin F. Roebel
Supervising Deputy Attorney General

Andrew M. Sweet
Deputy Attorney General
Indianapolis, Indiana